[S.F. No. 24047. Dec. 18, 1980.]

HOWARD JARVIS, Petitioner, v.
KENNETH CORY, as State Controller, et al., Respondents.

ARMIN BRODTY et al., Petitioners, v.
KENNETH CORY, as State Controller, et al., Respondents.

564

COUNSEL

Kaplanis & Grimm, Trevor A. Grimm, Schurmer, Drane, Bullis & McCarthy, Walter H. Drane, Lynn S. Carman and George R. Beavin for Petitioners.

George Deukmejian, Attorney General, Richard D. Martland, Assistant Attorney General, Talmadge R. Jones, George J. Roth, Susan J. Orton, Deputy Attorneys General, Loren E. McMaster and Bernard L. Allamano for Respondents.

Van Bourg, Allen, Weinberg & Roger, David Rosenfield, Stewart Weinberg, Ruth Benson and David E. Feller as Amici Curiae on behalf of Respondent California State Employees Association.

OPINION

MOSK, J.—In these consolidated cases petitioners Jarvis and Brodty seek writs of mandate declaring a salary appropriation bill unconstitutional and ordering respondent State Controller (Cory) to refrain from expending any funds pursuant to the bill. We must decide whether Senate Bill No. 91, 1979 Regular Session (SB 91), which awards a lump sum payment to certain state employees based on work already performed, violates provisions of the California Constitution that preclude the Legislature from enacting retroactive "extra compensation" for state employees (art. IV, § 17) and from sending an appropriation that augments a future budget act to the Governor before that act takes effect (art. IV, § 12, subd. (c)).

## I.

SB 91 was enacted on July 2, 1979, under circumstances described below. Immediately thereafter, Armin Brodty filed a taxpayers' action against Cory and the California State Employees Association (CSEA),[1] praying for mandatory and injunctive relief that would preclude Cory from implementing SB 91. When the trial court dismissed that suit, Brodty sought an original writ of mandate in this court. The following day, Jarvis filed a separate petition for mandate here, claiming the trial court's dismissal of the identical Brodty action established the inadequacy of relief below. We transferred both matters to the Court of Appeal, where they were consolidated. After decision in that court, we granted a hearing.[2]

Jarvis mounts a preliminary attack on SB 91 by contending that the timing of its enactment violates the constitutional prohibition against sending to the Governor a bill appropriating funds for expenditure during a fiscal year for which no budget bill has yet been enacted. (Cal. Const., art. IV, § 12, subd. (c).) In denying that the bill offends this provision, Cory relies on the bill's history and language and on the apparent purpose underlying the constitutional provision. His arguments convince us that SB 91 is not invalid under section 12.

Jarvis also contends SB 91 violates the extra compensation clause of the Constitution (art. IV, § 17), because it provides additional compensation for services already rendered at a time when employees had no right to a salary increase. In response, Cory asserts that (1) under the terms of SB 91, the lump sum award is prospective rather than retroactive and hence constitutional; (2) equal protection requires that we uphold SB 91 because we allowed retroactive raises for noncontract local employees on equal protection grounds in a 1979 decision; and (3) prior California holdings have carefully construed the extra compensation prohibition to exclude from its application salary adjustments comparable to those in the instant case.

Although we find Cory's first contention unpersuasive and do not reach the second, we are convinced the third is a correct application of the law. On examining the unique confluence of events that gave rise to

---

[1]CSEA was sued as "a proper party."

[2]For literary convenience, hereinafter our mention of Cory refers to both Cory and the CSEA, and our reference to Jarvis covers both Jarvis and Brodty.

SB 91, we conclude that the payments it authorizes are analogous to retroactive adjustments allowed public employees in prior cases where they have shown their salary levels were left uncertain during the period they rendered service. As will appear, important policy considerations reinforce our conclusion.

## II.

██ We first deal with Jarvis' claim that SB 91 is invalid as a pre-budget act appropriation.

Article IV, section 12, subdivision (c), provides in pertinent part: "Until the budget bill has been enacted, the Legislature shall not send to the Governor for consideration any bill appropriating funds for expenditure during the fiscal year for which the budget bill is to be enacted, except emergency bills recommended by the Governor or appropriations for the salaries and expenses of the Legislature."

The relevant provisions of SB 91 are sections 1, 1.5, and 2.8. Sections 1 and 1.5, virtually identical on their face, are alternative provisions: under the terms of section 2.8, section 1 would take effect only if the bill was enacted before the new fiscal year began on July 1 (§ 2.8, subd. (a)); section 1.5 would take effect only if the bill was enacted thereafter (§ 2.8, subd. (b)). Sections 1 and 1.5 both appropriate $207,669,500 from the state's General Fund and certain special funds for the contested salary increases. Under both sections, the salary increases are made as a lump sum payment to "current employees on or after May 31, 1979, and academic year employees employed at the end of their current academic year...equivalent to [a 7 percent salary increase from October 1, 1978, through June 30, 1979]." (§§ 1 & 1.5, subd. (a)(2).) The sections differ only in that under section 1 the appropriation is made "to augment" various items of the 1978-1979 Budget Act while under section 1.5 the same appropriation is made "for salary and benefit increases" provided in those items. In other words, section 1.5 does not directly augment the 1978-1979 Budget Act, but merely incorporates by reference the relevant items of that act, apparently because the Legislature feared it could not directly augment a budget act for a fiscal year already ended.

After months of consideration and revision, the Legislature passed the bill and sent it to the Governor on June 19, 1979. The Governor, whose failure to act upon a bill within 12 days normally results in its

automatic enactment (Cal. Const., art. IV, § 10, subd. (a)), retained it for the full 12 days, then vetoed the bill on July 1. The Legislature promptly overrode the veto on July 2, and the bill became law with section 1.5, appropriating money in the new fiscal year, operative. Although the Constitution directs the Legislature to pass the budget bill by June 15 (art. IV, § 12, subd. (c)), the 1979-1980 Budget Act was not adopted until July 6. Therefore, contends Jarvis, submission of SB 91 to the Governor on June 19 rendered the statute invalid.

The contention ignores the apparent purpose of section 12, subdivision (c), revealed by the phrase "the Legislature shall not send to the Governor." The provision is designed to enable the Governor to consider the budget bill without a clutter of appropriation measures for the upcoming fiscal year constantly crossing his desk. In sending SB 91 to the Governor on June 19, the Legislature did not violate that policy. When the Governor received it, SB 91 was a bill that, if enacted before July 1, would appropriate funds in a fiscal year for which a budget bill had long since been enacted. The mere possibility that it might appropriate funds in the forthcoming fiscal year did not bring it within the Constitution's explicit terms. Furthermore, the Governor had ample time before the next fiscal year began to consider and act on SB 91 as a bill augmenting the then-existing budget. It was not the Legislature's action, but the 12 days of contemplation by the Governor, that carried the bill into the 1979-1980 fiscal year and thus rendered it a prebudget act appropriation. Because the command of section 12, subdivision (c), is directed only at the Legislature, the Governor's delayed veto did not render SB 91 invalid.

Nor did the Legislature's subsequent override invalidate the statute. Upon override, the bill was sent not to the Governor for prebudget action but directly to the Secretary of State for filing. (See Gov. Code, § 12159.) Again, the policy of article 12, subdivision (c), was not offended. The Constitution focuses on the time at which the bill is "sent" to the Governor: if it is in compliance when he receives it, no inquiry about subsequent events is necessary or appropriate.

Accordingly, we hold the procedure by which SB 91 was enacted did not violate article IV, section 12, subdivision (c).

### III.

We now address the claim that SB 91 constitutes prohibited extra compensation.

Article IV, section 17, of the California Constitution declares in pertinent part: "The Legislature has no power to grant...extra compensation or extra allowance to a public officer, public employee, or contractor after service has been rendered or a contract has been entered into and performed in whole or in part...."

As previously noted, SB 91 provides salary adjustments for certain classes of state employees based on work performed during the fiscal year prior to the enactment of the statute. According to the bill (§§ 1 & 1.5, subd. (b)), the adjustments "are provided not as a retroactive salary increase, but for continued services rendered on or after the effective date of this act to the extent that any such services may be rendered. Recent events make these adjustments necessary to ensure the continued recruitment and retention of qualified and competent state employees. [¶] The lump sum...shall also be paid to those employees who retired between October 1, 1978, and May 31, 1979."

Cory relies on the above language in contending SB 91 does not violate the extra compensation clause because it establishes a prospective rather than retroactive salary increase. SB 91, according to Cory, confers benefits only on employees "currently employed as of July 2, 1979," and those benefits cannot be construed as retroactive simply because they are calculated on the basis of antecedent employment. If the Legislature had meant to grant extra compensation for past services, Cory argues, SB 91 would have covered all employees who worked between October 1, 1978, and June 30, 1979, whether or not they were still state employees on July 2.

That reading, we find, distorts the terms of SB 91. The bill does *not* confine the lump sum adjustment to current employees on or after July 2, 1979, the bill's effective date. Rather, recipients of the adjustment are explicitly designated as "current employees on or after May 31, 1979." If the Legislature had used July 2 as the crucial date, Cory's claim that the payment is prospective rather than retroactive would have arguable merit. As the bill reads, however, its benefits extend to employees terminated between May 31 and July 2.[3] The payment, then, can hardly be construed as a prospective benefit calculated on the basis of antecedent facts.

---

[3]At oral argument the Attorney General informed the court that the state is refusing to recognize the claims of those workers whose employment ended between May 31 and July 2, 1979. Nonetheless, the plain language of the bill compels our conclusion that the Legislature intended those workers to benefit.

Cory's reliance on the legislative pronouncement that the payments are for continued services is unavailing. He is unquestionably correct in contending that courts have relied on legislative declarations in evaluating statutes challenged as providing extra compensation. (*Rankin v. Colgan* (1891) 92 Cal. 605, 606-607 [28 P. 673]; *Stevenson v. Colgan* (1891) 91 Cal. 649, 652-653 [27 P. 1089]; *Jorgenson v. Cranston* (1962) 211 Cal.App.2d 292, 298-299 [27 Cal.Rptr. 297].) ■ But where a declaration is in irremediable conflict with a statute's substantive provisions, courts will not blindly bow to the Legislature's stated interpretation. (*California Emp. etc. Com. v. Payne* (1947) 31 Cal.2d 210, 214 [187 P.2d 702]; see also *Sonoma County Organization of Public Employees v. County of Sonoma* (1979) 23 Cal.3d 296, 309-311 [152 Cal.Rptr. 903, 591 P.2d 1] (hereinafter *Sonoma*), in which we found nonexistent the "fiscal crisis" declared by the Legislature to justify voiding certain local employment contracts.) Here it is impossible to reconcile the Legislature's declaration of prospective application with the statute's retroactive impact.

■ Retroactive payments, however, are not necessarily "extra compensation . . . after service has been rendered." Where employees' salary levels are not fixed with certainty while the employees are working, the compensation they ultimately receive for their work cannot accurately be deemed "extra compensation." This principle is demonstrated by two cases in which retroactive payments were made to local employees who had rendered services while their salary levels were being negotiated.[4]

In *San Joaquin County Employees' Assn., Inc. v. County of San Joaquin* (1974) 39 Cal.App.3d 83 [113 Cal.Rptr. 912], the county employees' association began its annual negotiations with the county in March 1972, and asked that the county bargain with regard to the question of retroactive raises. The county refused to do so on the grounds that no statute authorized such raises and that they would violate the Constitution's prohibitions against extra compensation and gifts of public money. (Art. IV, § 17; art. XIII, § 25 [now art. XVI, § 6].)

In holding that the employees' salary increases could be made retroactive to the expiration date of an existing salary ordinance, the Court of Appeal referred to the terms of the Meyers-Milias-Brown Act, which established the county's duty to "meet and confer in good faith" with its

[4]The California Constitution prohibits payment to local government employees of extra compensation for past services by either the Legislature (art. IV, § 17) or the local employer (art. XI, § 10).

employees' bargaining agent. Stressing that the act was predicated largely on the private sector's experience with labor relations, the court concluded that the Legislature must have contemplated pay raises retroactive to its target date for new employer-employee agreements (July 1), since such raises would correspond to private sector practices. The procedure was held not to violate the Constitution because "While negotiations are going on between Association and County, the question[s] of salaries and other matters relating to employer-employee relationships remain undetermined." (39 Cal.App.3d at p. 88.)

Similar reasoning was employed to sustain retroactive salary adjustments in *Goleta Educators Assn.* v. *Dall'Armi* (1977) 68 Cal.App.3d 830 [137 Cal.Rptr. 324]. In *Goleta*, negotiations for an annual raise for public school teachers were still in progress when the 1975-1976 school year began on September 11, 1975. The school board and the teachers' employee organization finally agreed to a raise, effective October 11, 1975; the board also agreed to make the raise retroactive to September 11. When the organization sought payment of the one-month retroactive adjustment, the trial court held it invalid as a violation of the extra compensation clause.

The Court of Appeal, however, upheld the retroactive adjustment. The court found that on September 11, the effective date of that adjustment, the teachers' salaries were undetermined because of the ongoing negotiations. The teachers were being paid according to the 1974-1975 salary rates, under ad hoc "offers of employment"; for all practical purposes, however, compensation rates were suspended for the duration of the contract negotiations. The retroactive increase, therefore, was not "extra" compensation but the final determination of the proper level of salary, which had been in doubt throughout the negotiation process. According to the *Goleta* court, "Although the certified employees had executed employment contracts providing for salaries payable under the 1974-1975 schedule, their salaries were indefinite since negotiations were being held.... Even though it was possible that the Board might have approved no increase, the salaries remained undetermined while under negotiation. This being so, the retroactive salary increase at issue did not constitute unconstitutional extra compensation for services already rendered." (*Id.* at p. 834.)

Both the *San Joaquin* and *Goleta* courts may have been influenced by the employees' willingness to work at their prior salary rates during the period of uncertainty. More importantly, both courts recognized

that if, while the employees are working, they justifiably contemplate the likelihood of future salary adjustments, they do not receive extra compensation when those adjustments are made. Furthermore, both cases illustrate that public employees need not have a legal expectancy or an enforceable claim to salary increases; it is enough that they are justifiably uncertain as to their precise salary level.

State employees, unlike the local workers in *Goleta* and *San Joaquin*, had no ability to negotiate their salary levels through a collective bargaining agent until after the 1978-1979 fiscal year began. (Gov. Code, § 3512 et seq.) They therefore cannot establish that their salary levels were uncertain by pointing to negotiation processes comparable to those in which the local employees were engaged. Nonetheless, even before they acquired collective bargaining rights, in some circumstances state employees could show their salaries were not fixed and certain during the time they rendered service, and hence could receive retroactive adjustments for such periods.

In fact, prior to 1978 state employees were empowered by statute to render their own salary levels indefinite by appealing to the appropriate salary-fixing authority for a change in salary range. (See, e.g., Gov. Code, § 18850.) If the authority determined that an adjustment was needed to make state salaries commensurate with those of local and private employees, it could, and still can, make that adjustment retroactive to the time the employee sought it. (*Ibid.*) In an opinion concluding that this retroactive adjustment procedure does not offend article IV, section 17, the Attorney General reasoned: "upon the filing of an application, the salary rate under consideration is not fixed but subject to change based upon prevailing rates in similar public and private employment." (39 Ops.Cal.Atty.Gen. 200, 203 (1962).)

In support of his conclusion, the Attorney General discussed another situation in which retroactive adjustments have been made. In at least two instances the Legislature, not the salary-fixing authority, has enacted retroactive appropriations to provide state workers with the salary adjustments to which they would have been entitled in the previous fiscal year had the money then been available. The Attorney General observed: "Apparently the Legislature has acknowledged the propriety of retroactive increases under circumstances where the salary rates were not definite or fixed during the period such adjustments were under consideration." (*Ibid.*) In other words, the Legislature appeared to conclude that where a conflict arose over the proper level of state employee

salaries but no appropriation existed to pay for the demanded increases, existing salaries were rendered indefinite until a final legislative determination was made, even if the determination was made in the following fiscal year.

The Attorney General's analysis supports our conclusion that the crucial question is whether salaries are fixed and certain. Although we refrain from holding categorically that employees can always render their wage levels uncertain from the time they demand increases, we do hold that under the extraordinary circumstances of fiscal year 1978-1979, state employees' salary levels were a matter of legitimate, on-going dispute and uncertainty, and could therefore be retroactively adjusted without offense to the Constitution.

Jarvis relies on the simple fact that in July 1978 the Governor froze state salaries for fiscal year 1978-1979 as sufficient proof that salaries were both fixed and certain. But a review of the unique situation out of which the Governor's freeze arose demonstrates that state employees had good reason to treat the Governor's pronouncement as but the latest in a number of tentative salary adjustments, which could be superseded as the unprecedented impact of Proposition 13 (Cal. Const., art. XIII A) was more fully evaluated.

Although California is renowned for its earthquakes, no tremor of high Richter-scale proportion has shaken it quite like the enactment of Proposition 13. Every local entity in the state feared potential economic collapse in the aftershock of that momentous decision by the people. Because the state had accrued a sizeable surplus of funds, it was immediately called upon to help maintain local governments through the initial period of drastic revenue loss.[5]

The effect on state employees was also drastic. Before Proposition 13 passed, the State Personnel Board reported to the Governor and Legis-

---

[5]See *Sonoma*, 23 Cal.3d at pages 309-310, for a description of the severe impact Proposition 13 was expected to have on local governments in the absence of timely state intervention. As previously noted, in *Sonoma* we ultimately held that Proposition 13 did not result in a "grave fiscal crisis" for local governments justifying state impairment of local employment contracts. But we so held because the state intervened to stem the anticipated crisis with an unprecedented injection of surplus funds into local coffers, eliminating any potential justification for its simultaneous interference with contractual relationships. Our decision cast no doubt on the generally recognized truth that Proposition 13 posed a serious threat to the economic stability of local governments, prompting a speedy and extraordinary reaction by the state.

lature that to allow the board to fulfill its duty to keep salary levels in line with those in the private sector, the state should appropriate funds sufficient to increase salaries 9.5 percent. (State Personnel Bd., Rep. to Governor and Leg. (Jan. 10, 1978).) But after Proposition 13 passed on June 6, 1978, the Legislature decided that only a 2.5 percent increase should be paid, and it so provided in the budget bill. Furthermore, it enacted Senate Bill 154 (the so-called "bailout bill"), which earmarked $5 billion in state funds for local use, restricted funding eligibility to localities that maintained their employee raises on a par with state raises, and declared null and void existing local employment contracts entitling employees to cost of living increases greater than those the state employees would receive. Shortly thereafter, the Governor concluded that even a 2.5 percent increase in salaries would prevent the state from rendering sufficient aid to localities. He therefore vetoed that portion of the budget bill, the remainder of which was enacted on July 6.[6] Thus in the span of one month, state employees' salary levels for the upcoming year were twice drastically altered. Because the Governor's action prevented enactment of the new salary statute, salaries were determined by existing provisions in the budget of the previous year, much as the interim salary levels in *San Joaquin* and *Goleta* were determined by the employment agreements of the previous year.

The text of the Governor's veto announcement, moreover, gave state employees reason to believe their salaries were subject to change. The Governor made clear to the employees that he was imposing the salary freeze as an "interim" measure to combat the extraordinary impact of Proposition 13. His action came within one month of the enactment of Proposition 13, clearly at a time when the actual effect of that provision was only speculative. Because the freeze was imposed solely to counter the uncertain impact of Proposition 13, the necessary level of salary sacrifice was also uncertain. That it was in fact inconstant is demonstrated by the disparity between the Legislature's proposal of a 2.5

---

[6]Although no appropriation for payment of any salaries existed from July 1 to July 6, when the budget bill was finally passed, state employees faithfully attended work as usual during that period and were ultimately compensated as if their salaries had been established from the beginning of the fiscal year. This procedure has practically become an annual event, and illustrates not only that state employees have often worked without guarantee of salary yet ultimately received compensation, but also that in interpreting article IV, section 17, a sensible recognition of the imperfect and cumbersome machinery of state government has long been the prevailing practice. Strict interpretation would impose needless restraints on the ability of the state to function, and we find unacceptable the proposition that the Constitution was intended to annually bring state government to a grinding halt.

percent salary increase and the Governor's decision to allow no increase at all.

Salary levels were also rendered uncertain by the Governor's description of his action as a salary "freeze." In the recent past, use of this term in relation to salaries has implied a temporary blockage of the ordinary flow of wage adjustments. Once the blockage is removed, employees have been allowed to receive the benefits theretofore held back.

For instance, under the Economic Stabilization Act of 1970, the federal government imposed what was commonly known as a wage and price freeze. In 1973, the Cost of Living Council, the federal agency responsible for enforcement of the act, attempted to prevent state wage increases of 11 percent by imposing a freeze on wage increases in excess of 7 percent. Nonetheless, eventually the state bestowed retroactive salary increases at the original rates by reappropriating the funds originally available therefor. (See *United States* v. *State of California* (T.E.C.A. 1974) 504 F.2d 750.) The *Sonoma* case, decided while the state salary freeze was still in effect, illustrated again that the lifting of such a freeze can result in receipt of the wages held back. There we held unconstitutional as an impairment of contract the Legislature's attempt to void local employment agreements granting cost of living increases greater than those state employees would receive. Yet local employees were thereafter allowed to receive the increases to which they would have been entitled if the state freeze had not been imposed.[7]

Apparently, in neither the 1973 federal freeze case nor in *Sonoma* was the retroactive adjustment challenged as violative of article IV, section 17. We do not rely on those cases to demonstrate that wage "freezes" may invariably be retroactively erased without constitutional violation. We refer to them merely as one of several bases upon which state employees could reasonably conclude that the Governor's action was not irrevocable, and that salaries were therefore not fixed with certainty.

After the enactment of Proposition 13, state employees continually attempted to restore their cost of living increases. As noted above, the

[7]While some local employees had contractual rights to salary increases, others were allowed to receive increases because we concluded the Legislature did not intend to treat them differently from those with contract rights. Because we hold state employees' salaries were not fixed with certainty, we need not reach Cory's contention that equal protection as between state and local employees also requires us to approve the increase.

employees had no collective bargaining representation at the start of the 1978-1979 fiscal year. They therefore had no ability to actually negotiate their salaries with the state, as could the local workers in *Goleta* and *San Joaquin.* Nonetheless, they apparently invoked all available opportunities to persuade the state to adjust their salaries.

Just two days after Proposition 13 passed, the CSEA requested salary increases of the Personnel Board, reminding the board of its duty to establish salary levels for state employees comparable to those of similarly employed private and local workers. When the board was rendered unable to grant the requests by the Governor's salary appropriation freeze, the employees focused their efforts on the Legislature. The result was the introduction of SB 91 in December 1978, and its passage over the Governor's veto in July 1979.[8] Here, as in *San Joaquin* and *Goleta,* the employees patiently continued to work at salary levels set in the previous year while their representatives attempted to secure higher rates of pay. The ongoing activities of the representatives were as closely analogous to a negotiation process as any they were empowered to conduct. Although, like the *San Joaquin* and *Goleta* employees, state employees could assert no enforceable entitlement to a salary increase, their diligent efforts to secure readjustment of their salaries contributed to the existing uncertainty whether the amount shown on their paychecks was the amount they would ultimately receive for their work.

In February 1979 state employees received yet another reason to believe their salaries were not fixed with certainty. In addition to illustrating the fact that wage freezes are sometimes retroactively eliminated, our decision in *Sonoma* contributed significantly to an understandable uncertainty surrounding state wage levels. With Proposition 13 jeopardizing the ability of local governments to function, the state decided to help make surplus funds available by denying its own employees wage increases. But when the state's effort to treat local employees in the same manner was declared unconstitutional in *Sonoma,* state employees were left bearing the burden of sacrifice while employ-

---

[8]Jarvis contends the CSEA overzealously threatened illegal strikes if the Legislature did not pass SB 91, and he would apparently have us invalidate the statute for that reason. We have held, however, that "although the taxpayer claims that legislative measures are invalid in their entirety because they were adopted 'as a result of,' and 'under the coercion of,' an illegal public employee strike, the controlling authorities clearly establish that such a contention does not constitute a permissible basis for invalidating duly enacted legislation." (*City and County of San Francisco* v. *Cooper* (1975) 13 Cal.3d 898, 905 [120 Cal.Rptr. 707, 534 P.2d 403].) A fortiori, claiming that a statute was enacted "under the coercion of" mere threats of strike cannot establish a permissible basis for invalidation.

ees of local governments, against which Proposition 13 was presumably directed, were allowed to enjoy cost of living raises. That perverse turn of events justified a belief that the Legislature would recognize the cruel irony of the situation and reconsider the cost of living raises state employees had as yet been denied. The Legislature did precisely that: the history of SB 91 reveals that shortly after *Sonoma* was decided, legislators filled in the details of the bill and mounted a sustained effort to enact it.[9]

## IV.

The foregoing discussion demonstrates the numerous elements that converge in this case to compel our conclusion that state employee salary levels were not fixed with certainty during the 1978-1979 fiscal year and hence the Constitution was not violated. Our conclusion is further supported by an analysis of the policies underlying article IV, section 17.

Early decisions interpreting the extra compensation clause demonstrate that its framers had a particular, narrow objective in mind—an objective that would not be served by a literal reading of the clause in the present case. The primary purpose of the prohibition, as we pointed out not long after its adoption, was to prevent the Legislature from enacting "private statutes" in recognition of "individual claims." Thus, we said, the provision "denied to the Legislature the right to make direct appropriations to *individuals* from general considerations of charity or gratitude, or because of some supposed moral obligation . . . ." (Italics added.) (*Stevenson* v. *Colgan* (1891) *supra*, 91 Cal. 649, 651; see also *Miller* v. *Dunn* (1887) 72 Cal. 462, 467-468 [14 P. 27].)

[9]In an amicus brief, the Council of University of California Faculty Associations (Council) contends that because the Governor and Legislature erroneously believed they could control local salaries when they enacted Senate Bill No. 154, their decision at that time to freeze state salaries was based on a mistaken premise, and they should be allowed to retroactively correct the mistake by increasing state salaries. The Council relies on *Sonoma* as precedent, because the effect of that decision was to allow local employers to grant retroactive raises they had erroneously believed were prohibited by a valid state law.

In view of our disposition herein we need not reach this novel contention, which would require a comparison of the different types of mistake involved in the two cases and a determination of what the Legislature and Governor would have done had they originally realized local salary levels were beyond their control. Nevertheless, the possibility of a legal mistake theory of recovery after *Sonoma*, or recovery based on the equal protection theory mentioned above (fn. 7, *ante*), lends additional support to the claim that state employees in 1978-1979 could continue to work on the justifiable assumption that their salary levels had not yet been finally determined.

SB 91 is not the type of statute that the extra compensation clause was designed to prohibit. Its drafters are scarcely in the same category as 19th century legislators besieged by employees in search of "public benevolence" after working "without *express* authorization...or under palpably unauthorized and invalid contracts." (*Miller, supra,* at p. 468; italics in original.) On the contrary, the Legislature here, in the post-Proposition 13 period, enacted a raise for virtually all state employees who worked during the relevant period of uncertainty; in that sense, then, the legislators may be seen as analogous to public or private employers participating in collective bargaining negotiations when a prior contract has expired.

Not only is the concern about private legislation inapposite here, but so is the intention to prohibit payments bottomed on a mere moral obligation. Although the Legislature is under no legal compulsion to appropriate money for cost of living raises (*California State Employees' Association* v. *Flournoy* (1973) 32 Cal.App.3d 219, 234-235 [108 Cal.Rptr. 251]) it must recognize that the Personnel Board and other salary-setting entities are directed to fix state salaries at competitive levels, and that they cannot do so unless appropriations are made for that purpose. (Gov. Code, § 18850; Ed. Code, § 89517.) As it became clear that state salaries were lagging significantly, the Legislature perceived, as it declared in the act, more than a simple moral duty to reconsider salary appropriations.

Furthermore, the Legislature may have perceived a potential legal obligation to pay state employees after our decision in *Sonoma*. ▆ ▆▆▆ Although we have found it unnecessary to reach the state employees' equal protection claim herein based on the raises given to local employees after *Sonoma,* there is arguable merit to the contention of Cory that the Legislature may well have deemed the equal protection claim sufficient to justify enactment of SB 91.[10]

---

[10]Jarvis contends SB 91 is invalid as a gift of public funds serving no substantial public purpose. (Cal. Const., art. XVI, § 6; *County of Alameda* v. *Carleson* (1971) 5 Cal.3d 730, 745-746 [97 Cal.Rptr. 385, 488 P.2d 953].) On the contrary, the Legislature found that the adjustments made by the bill were "necessary to ensure the continued recruitment and retention of qualified and competent state employees." We will not disturb the Legislature's finding of a public purpose so long as it has a reasonable basis. (*Carleson, supra,* at p. 746.)

In this case, we cannot doubt the substantiality of the purpose stated. Nor can we doubt that SB 91 serves the purpose by assuring state employees they will not be abandoned in troubled times, and by raising salaries to a level more competitive with those in the private sector. (See *San Joaquin, supra,* 39 Cal.App.3d at pp. 87-88.) Further-

## V.

The conditions surrounding the passage of SB 91 are *sui generis*: we would be astonished to again see so many atypical events and forces combine to clearly demonstrate that wage levels, ostensibly rendered immutable by the Governor's action, still remain imprecise. In fact, now that state employees enjoy collective bargaining rights, they may not again find it necessary to rely on events extraneous to the negotiation process to establish their salaries to be indefinite. Instead, they may express their discontent through continued negotiations without jeopardizing the right to receive salaries retroactively at the level to which the state ultimately agrees.

██ Whether or not collective bargaining is involved, the extra compensation clause is not offended when state employees receive retroactive salary adjustments for periods during which they worked with justifiable uncertainty regarding their salary levels. Since we are persuaded in this case that the uncertainty was justified, we do not hesitate to uphold the Legislature's overwhelming decision to make such retroactive adjustments. We conclude that SB 91 offends neither the extra compensation clause nor the prebudget act appropriation clause of the California Constitution.[11]

The alternative writs of mandate are discharged and the petitions are denied.

Clark, J., Newman, J., and Brown (Gerald), J.,* concurred.

Manuel, Acting C. J., concurred in the judgment.

**RICHARDSON, J.,** Dissenting.—I agree with section II of the majority opinion wherein my colleagues determine that Senate Bill No. 91 (S.B.

more, our discussion has revealed at least three other public purposes served: (1) avoidance of legal disputes over colorable equal protection claims, (2) provision of funds to allow salary-setting bodies to fulfill their duties, and (3) resolution of continuing uncertainty about proper salary levels. SB 91 is therefore not a gift of public monies.

[11]CSEA has made a motion for an award of interest at the legal rate for the period during which payment has been delayed. Inasmuch as there is no showing that respondent Cory will refuse to pay such interest, if any is due, we do not reach the merits of the motion but deny it as premature. (See *Sanders v. City of Los Angeles* (1970) 3 Cal.3d 252, 262-263 [90 Cal.Rptr. 169, 475 P.2d 201].)

*Assigned by the Acting Chairperson of the Judicial Council.

91) does not constitute a "prebudget act appropriation." I have concluded, however, that there is an irreconcilable conflict between S.B. 91 and article IV, section 17, of the California Constitution, and, accordingly, respectfully dissent. Doubtless, the Legislature was well motivated and sought a fair solution in its adoption of S.B. 91. In my view, however, the act can be sustained only by impermissibly cutting constitutional corners in attempting to reach a benevolent result.

Article IV, section 17, provides in relevant part: "The Legislature has no power to grant...extra compensation...to a...public employee... after service has been rendered...."

S.B. 91, which became effective July 2, 1979, purported to provide a lump sum payment to certain designated state employees who worked as such between October 1, 1978, and June 30, 1979, and who were either retired or employed by the state on or after May 31, 1979. The payment to such employees is an amount "equivalent to that which they would have otherwise received from October 1, 1978, through June 30, 1979, had they received a 7 percent salary increase on October 1, 1978."

Terming S.B. 91 a "retroactive adjustment" the majority professes to find constitutional support for the act primarily by analogy to two earlier cases, *San Joaquin County Employees' Assn., Inc.* v. *County of San Joaquin* (1947) 39 Cal.App.3d 83 [113 Cal.Rptr. 912], and *Goleta Educators Assn.* v. *Dall'Armi* (1977) 68 Cal.App.3d 830 [137 Cal. Rptr. 324]. With due respect, I believe that neither case is comparable. In *San Joaquin County* a written agreement between county and its employees required annual negotiations and bargaining. The contract specifically contemplated the county's obligation to pay retroactive pay increases "for services to be performed at a time when wage and salary rates are not fixed and are indefinite" because the previous agreement had expired. Bargaining negotiations between the parties continued, during which period the county's employees remained working, and the amounts of salaries were "undetermined." When the negotiations culminated in a new agreement providing for retroactive pay increases, the appellate court reasoned: "County was required to bargain in good faith. If in so bargaining County reached the conclusion that pay raises should be retroactive to the expiration date of the last salary ordinance, good faith required it to implement the results of negotiations between itself and the Association by making pay raises retroactive to such date." (39 Cal.App.3d at p. 89.) The *San Joaquin County* court

stressed the "undetermined" nature and amount of salaries "while nego-tiations are going on." Having bound itself by contract, the county was thus obligated both to negotiate in good faith and then to live up to its negotiated commitments.

Similarly, *Goleta* involved the conclusion of annual salary negotia-tions for public school teachers one month after the first day of the new school year. The *Goleta* court sustained the school board's payment of the negotiated increased salary for the entire new year, including the one month which preceded completion of the negotiations. Again, as in *San Joaquin County*, the employees' "salaries were indefinite since ne-gotiations were being held. . . . If during these sessions the Board determined that the pay raises should be retroactive to the beginning of the school year, good faith required it to implement the results of these negotiations by making the pay raises retroactive." (68 Cal.App.3d, at p. 834.)

It is readily apparent that neither *San Joaquin County* nor *Goleta* is analogous to, or helpful in, the resolution of the issue before us. In the instant case, as the majority must acknowledge, the involved state em-ployees possessed no ability during the critical period to negotiate their salaries through a bargaining agent. "They therefore cannot establish that their salary levels were uncertain by pointing to negotiation proc-esses comparable to those in which the local employees were engaged." (*Ante*, p. 572.) This absence of any continuing negotiation clearly dis-tinguishes both of the cited cases from the present one. Moreover, there can be no reasonable doubt that (1) the payments authorized by S.B. 91 constitute "extra compensation" and (2) the services for which S.B. 91 authorized payment had already "been rendered."

The majority attempts to salvage S.B. 91, however, by extracting from *San Joaquin County* and *Goleta* a general principle that even though there are no ongoing negotiations, if public employees in some way can show that "they are justifiably uncertain as to their precise sal-ary level" a subsequent retroactive award of "extra compensation" is constitutionally permissible. The majority then purports to find the req-uisite "uncertainty" in this case resulting from the fiscal impact of Proposition 13, the Governor's wage freeze of 1978, and other federal and state action.

To permit these random public fiscal developments to create a legal "uncertainty" thus authorizing a retroactive pay raise is, I suggest, judi-

cial sleight of hand. The simple fact is that there was no cognizable or real "uncertainty" about the salaries of state employees during the period in question. Notwithstanding Proposition 13, inflation, and wage freezes, to my knowledge there is not a single state employee, new or old, who could not by reference to his own classification and the pertinent salary schedule of the State Personnel Board have ascertained to the precise penny what his or her salary was. (See Gov. Code, § 18850, subd. (a).) Any "uncertainties" that surrounded state employee salaries in the critical period were those of the general citizenry, namely, the unpredictable, unknown, unfolding of daily events colored, in their economic and fiscal aspects, by the ebb and flow of a severe inflationary cycle, fueled by an international trade deficit, manifest in a severely declining dollar value and motivating, as to state employees, increasing pressure for some form of legislative relief. There may have been "uncertainty" as to what the response to this political·pressure might be. There was *no* "uncertainty," however, about the amount of salaries of the affected employees during the period of their previous services. Those salary levels were fixed and readily ascertainable. Nor were there any ongoing negotiations to change them. The employees might, and doubtless did, wish for a deserved increase. Indeed, this desire might have ripened into a hopeful expectancy. But, with due respect, I suggest that it is pure fiction to conclude that in any legal sense "their salaries were not fixed and certain during the time they rendered service. . . ." (*Ante*, p. 572.)

*Sonoma County Organization of Public Employees v. County of Sonoma* (1979) 23 Cal.3d 296 [152 Cal.Rptr. 903, 591 P.2d 1], affords no support for the majority's thesis. Interestingly, in *Sonoma* last year we examined the same "fiscal crisis" occasioned by Proposition 13 within the context of a local entity's written memorandum of understanding with its employees, ratified by ordinance, which provided for a wage increase. Rejecting, on impairment of contract grounds, the county's attempt to evade its agreement, we were much more restrained than the present majority in our evaluation of the impact of Proposition 13. We unanimously concluded there that the county had "*not* demonstrated that Proposition 13 created an emergency warranting the invalidation of salary increases called for in petitioners' contracts" (23 Cal.3d at p. 313, italics added), and indeed had failed to establish "that an emergency existed." (P. 312).

There is no evidence that our *Sonoma* decision prompted the adoption of S.B. 91. Although the statute was *adopted after Sonoma*, S.B.

91 was *introduced before* that case was decided. More significantly, as noted, the successful *Sonoma* plaintiffs demonstrated a clear binding contract for added compensation which was constitutionally protected from impairment. *Sonoma* was a very narrow holding incapable of any reasonable expansion to cover the present case which lacks both a prior binding contract and ongoing negotiations.

The constitutional command is clear: The Legislature has no power to award extra pay to state employees for their work after it has been performed. Where the challenged meaning and words are plain, explicit and certain, there is no occasion for the extended, historical analysis advanced by the majority and which is a permissible judicial technique when interpreting vague or ambiguous constitutional or statutory language.

I also find rather startling the suggestion of the majority that public employees may render their own salary levels legally "uncertain" by the mere expedient of seeking a "raise" pursuant to statutory procedures. So viewed, every salary in state service, of course, may be considered "uncertain." Until the request is acted upon, the possibility of a favorable official response creates in that sense an "uncertainty." This, of course, is "bootstrapping" in its purest form. If accepted it would mean the speedy and complete frustration of the people's clear mandate in article IV, section 17. One might as readily rely upon the "uncertainty" of life itself.

To summarize, the majority has reached afar seeking to establish extraneous events and circumstances supporting its "conclusion that state employee salary levels were not fixed with certainty during the 1978-1979 fiscal year..." (*ante*, p. 577) or, in some manner, "remain imprecise" (*ante*, p. 579). I do not find them so.

Rather, I fully agree with the following thoughtful reasoning and analysis of Justice Janes, writing for a unanimous Court of Appeal in this case: "[W]e have analyzed S.B. 91 with the view, if possible, 'to effectuate the purpose of the law' (*Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672]), and find that the purpose of S.B. 91 is to grant extra compensation or extra allowance to public officers and employees after service has been rendered. Therefore, we cannot effectuate the expressed purpose of the statute in the face of article IV, section 17.

"•.   •   •   •   •   •   •   •   •   •   •   •   •   •   •

"By the specific terms of S.B. 91, the amount of the extra compensation is to be determined solely as a function of the length of already completed employment time between October 1, 1978, and June 30, 1979. The payments to be made are not in consideration of any bilateral contract or agreement to perform services in the future or in consideration of any unilateral contract or promise to perform a requested service in the future. Notwithstanding the bill's recital that the 'adjustments' provided are 'for continued services rendered on or after [July 2, 1979] to the extent any such services may be rendered,' S.B. 91 does not require any 'current employee' or any 'academic year employee' to do any service or to perform any act whatever in consideration of the lump sum payment. All that the employee need plead and prove is that he worked as a state employee between October 1, 1978, and June 30, 1979, and that he was either retired or employed by the state on or after May 31, 1979.

"S.B. 91 was not filed with the Secretary of State until 8 p.m. on July 2, 1979. Thus no 'current employee' performed any services on that date because of, in reliance upon, or before the bill's effectiveness. No work was *required* on July 3, 1979, or thereafter, by the bill. If hypothetical employee A commenced work on July 2, 1979, he would receive no payment under the bill. If employee B had held his position since on or before October 1, 1978, he would get a lump sum payment based upon his work from October 1, 1978, through June 30, 1979. If employee C likewise commenced work on or before October 1, 1978, but retired sometime between that date and May 31, 1979, he also would receive a lump sum, but in a lesser amount than employee B, since employee C would not have as much past service during the critical period October 1, 1978, through June 30, 1979.

"The above hypotheses illustrate the fact that S.B. 91 provides payment for *past* services, or, in the words of article IV, section 17, 'extra compensation...after service has been rendered'....

"•.   •   •   •   •   •   •   •   •   •   •   •   •   •   •

"We are mindful of the decreasing purchasing power of the dollar and of the ravages of inflation upon all employees. However, we cannot avoid the plain language and meaning of either article IV, section 17 or S.B. 91. Both the Constitution and the statutory language are clear, and

the intent can be ascertained therefrom without ambiguity. We are thus left with no room for construction and interpretation. (See *Stockton Sav. & Loan Bank* v. *Massanet* (1941) 18 Cal.2d 200, 207 [114 P.2d 592]; see also 45 Cal.Jur.2d, Statutes, § 121, pp. 629-630.) The two measures are irreconcilable."

I would reaffirm the sound principle unanimously expressed by us last year in *Longshore* v. *County of Ventura* (1979) 25 Cal.3d 14, 22-23 [157 Cal.Rptr. 706, 598 P.2d 866]: "A public employee is entitled only to such compensation as is expressly and specifically provided by law.... [¶] [T]he employee's rights are set by the law *applicable at the time compensable services are rendered.* The Constitution forbids state or local enactments which *retroactively* grant compensation for work *already performed.*" (Italics added.)

The California Constitution was meant to be enforced even when the result may be unpopular. It contains no exceptions to combat the erosion of inflation. I am fully sensitive to the appeal which favors the just and fair treatment of public employees obviously intended by the people's representatives in the Legislature. Nonetheless, as I view it, there is an even higher call: namely, the clear and express will of the people themselves embodied in their own Constitution which it is our function to interpret. The Constitution itself in its first article provides that its provisions are mandatory and prohibitory unless expressly declared otherwise. (Art. I, § 26.) Referring to this section, almost 100 years ago we held that "This rule is an admonition placed in this the highest of laws in this State, that its requirements are not meaningless, but that what is said is meant, in brief, 'we mean what we say.' Such is the declaration and command of the highest sovereignty among us, the people of this State...." (*Matter of Maguire* (1881) 57 Cal. 604, 609.) Shortly thereafter, we reaffirmed the rule in *Oakland Paving Co.* v. *Hilton* (1886) 69 Cal. 479, 512 [11 P. 3], saying, "Under the stress of this rule, it is the duty of this court to give effect to every clause and word of the constitution, and to take care that it shall not be frittered away by subtle or refined or ingenious speculation. The people used plain language in their organic law to express their intent in language which cannot be misunderstood, and we must hold that they meant what they said." (See, *State Board of Education* v. *Levit* (1959) 52 Cal.2d 441, 460 [343 P.2d 8]; *People* v. *County of Santa Clara* (1951) 37 Cal.2d 335, 341 [231 P.2d 826]; *People* v. *City of San Buenaventura* (1931) 213 Cal. 637, 639-640 [3 P.2d 3].)

In my view, the hard, unpalatable but inescapable truth is that S.B. 91 is invalid because it conflicts with article IV, section 17, of the Constitution.

I would grant petitioners the relief sought.

Files, J.,* concurred.

Petitioners' application for a rehearing was denied February 17, 1981. Bird, C. J., and Tobriner, J., did not participate therein. Files, J.,* and Brown (Gerald), J.,* participated therein. Richardson, J., and Files, J.,* were of the opinion that the application should be granted.

*Assigned by the Acting Chairperson of the Judicial Council.