695 F.2d 366
 BECK PARK APARTMENTS; Carson Apartments; Casa Bien
Association; Centralia Apartments; Cerise
Investment Co. Ltd., et al., Plaintiffs-Appellants,
v.
UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT;
Moon Landrieu; Emma D. McFarland; Arthur Timmel,
et al., Defendants-Appellees.
 No. 81-4270.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 13, 1982.
Decided Dec. 23, 1982.
 
 John F. Dienelt, Brownstein, Zeidman & Schomer, Washington, D.C., for plaintiffs-appellants.
 Howard S. Scher, Washington, D.C., argued, for defendants-appellees; Francis M. Goldberry, III, Sacramento, Cal., Anthony J. Steinmeyer, Washington, D.C., on brief.
 Appeal from the United States District Court for the Eastern District of California.
 Before KASHIWA,* WALLACE and ANDERSON, Circuit Judges.
 J. BLAINE ANDERSON, Circuit Judge:
 
 FACTS
 
 1
 Beck Park Apartments, et al. (Beck Park), are owners of thirty-four federally subsidized multifamily housing projects in California. Each owner participates in Housing and Urban Development (HUD) programs pursuant to section 221(d)(3), 12 U.S.C. Sec. 1715l(d)(3), or section 236, 12 U.S.C. Sec. 1715z-1, of the National Housing Act (Act), 12 U.S.C. Sec. 1701 et seq.
 
 
 2
 Pursuant to the Act, HUD drafted and entered into a Regulatory Agreement (agreement) with each project owner. 12 U.S.C. Sec. 1715z-1(h); 12 U.S.C. Sec. 1715l (d)(3). The agreement establishes certain rights and obligations of the parties with respect to each project.
 
 
 3
 Following the passage of Proposition 13, which lowered real property taxes in California, HUD reevaluated rent schedules in section 221(d)(3) and section 236 projects in California.[1] The purpose of the reevaluation was to insure that the rents reflected expenses necessary to operate the projects. The reevaluation, based on owner submitted data concerning all operating expenses, resulted in decreasing rents for some projects.
 
 
 4
 After HUD ordered Beck Park to reduce rents charged, Beck Park instituted this action, alleging that HUD's actions breached the agreement and violated the notice and opportunity for comment provisions of the Administrative Procedures Act, 5 U.S.C. Sec. 551 et seq. The district court granted partial summary judgment for HUD on the breach claims and directed entry of judgment under Fed.R.Civ.P. 54(b). On appeal, Beck Park contends that the agreement, described below, precluded HUD from initiating decreases in rents.
 
 A. Statutory Background
 
 5
 The goal of the National Housing Act is to provide a "decent home and suitable living environment for every American family." 42 U.S.C. Sec. 1441a(a); 12 U.S.C. Sec. 1701t. HUD must act in a manner consistent with the objectives and priorities of the Act. 42 U.S.C. Sec. 1441; Portela v. Pierce, 650 F.2d 210, 211 (9th Cir.1981); Russell v. Landrieu, 621 F.2d 1037, 1041-42 (9th Cir.1980) Abrams v. Hills, 547 F.2d 1062, 1064 (9th Cir.1976), vacated on other grounds, Pierce v. Abrams, --- U.S. ----, 102 S.Ct. 1700, 72 L.Ed.2d 127 (1982).
 
 
 6
 The section 221(d)(3) program was designed to assist private industry in providing housing for low and moderate income families and displaced persons. 12 U.S.C. Sec. 1715l (a). To achieve that purpose, project owners receive a subsidized interest rate and are subject to controls on admissions, rents, and profits. 12 U.S.C. 1715l (d)(3), Geneva Towers Tenants Organization v. Federated Mortgage Investors, 504 F.2d 483, 486-87 (9th Cir.1974). With respect to rents in the section 221(d)(3) program, the Secretary's regulations require the Secretary to consider the income necessary to maintain a project's economic soundness and to provide a reasonable return to owners on their investment consistent with providing reasonable rentals to tenants. 24 C.F.R. Secs. 221.531(c)(1), 221.531(c)(2).
 
 
 7
 The section 236 program was designed to reduce rentals for lower income families by providing federal mortgage insurance and interest reduction payments to owners. 12 U.S.C. Sec. 1715z-1(a); Abrams, 547 F.2d at 1064-65. Project owners must agree to be regulated by HUD with respect to rents. 12 U.S.C. Sec. 1715z-1(e). Rents are based on the cost of operating the project. 12 U.S.C. Sec. 1715z-1(f)(1). The Secretary is authorized to make regulations, enter agreements, and adopt procedures to carry out the program. 12 U.S.C. Sec. 1715z-1(h). The Secretary's regulations with respect to rental charges are set forth at 24 C.F.R. Secs. 236.55, 236.56, 236.60.
 
 B. Discussion
 1. Standard of review
 
 8
 This court may affirm the district court's grant of summary judgment on the breach of contract claims if the record shows, after reviewing the evidence and factual inferences in the light most favorable to the appellant, that there are no genuine issues of material fact and the appellee is entitled to prevail as a matter of law. EEOC v. County of Santa Barbara, 666 F.2d 373, 378 (9th Cir.1982); Dosier v. Miami Valley Broadcasting Corp., 656 F.2d 1295, 1300 (9th Cir.1981).
 
 
 9
 Interpretation of a contract is a matter of law. Libby, McNeill and Libby v. City National Bank, 592 F.2d 504, 512 (9th Cir.1978). Whether a contract is ambiguous is also a question of law. United States v. Sacramento Municipal Utility District, 652 F.2d 1341, 1343 (9th Cir.1981). If a contract is unclear, summary judgment is ordinarily inappropriate. Id. at 1344.
 
 2. The Regulatory Agreement
 
 10
 The agreement for a section 221(d)(3) project provides in part:
 
 
 11
 4. (d) The Commissioner will at any time entertain a written request for a rent increase properly supported by substantiating evidence and within a reasonable time shall:
 
 
 12
 (1) Approve a rental schedule that is necessary to compensate for any net increase, occurring since the last approved rental schedule, in taxes (other than income taxes) and operating and maintenance expenses over which owners have no effective control, or
 
 
 13
 (2) Deny the increase stating the reasons therefor.[2]
 
 
 14
 The section 236 agreement contains the following language:
 
 4. The Owners covenant and agree that:
 
 15
 (a) with the prior approval of the Commissioner, they will establish for each dwelling unit (1) a basic rental charge determined on the basis of operating the project with payments of principal and interest under mortgage bearing interest at one percent and (2) a fair market rental charge determined on the basis of operating the project with payments of principal interest and mortgage insurance premiums due under the insured mortgage on the project.
 
 
 16
 (b) the rental charged for each unit, which will include all utilities except telephone, will be equal to 25% of the tenant's income or the basic rental, whichever is greater, but in no event shall the rental charged exceed the fair market rental;[3]
 
 
 17
 HUD has interpreted the section 236 agreement to give owners the right to request a rental increase.
 
 
 18
 Beck Park contends that only project owners have the right to initiate rent adjustment decisions and the Secretary's authority is limited to approving or disapproving an owner's proposed rent adjustment. Beck Park bases this argument on: (1) the above language in the agreement; (2) HUD's past practice of only adjusting rents pursuant to an owner's request; and (3) a HUD handbook provision which states that an owner is encouraged to reduce rents on his own when appropriate.
 
 
 19
 We do not interpret the agreement as precluding HUD from initiating rent reductions. First, the language of the agreement does not address rent decreases; it only addresses rent increases. The fact that owners may request rent increases does not compel the conclusion that owners have sole power to initiate rent adjustments.
 
 
 20
 The Sixth Circuit addressed an analogous situation in Texas Gas Transmission Corp. v. Federal Power Commission, 441 F.2d 1392 (6th Cir.1971). The court interpreted a settlement agreement that was silent on the issue of whether Texas Gas had to flow through certain refunds to their customers. Texas Gas argued that because the agreement referred to two specific categories of refunds that it agreed to flow through to customers, and the refunds at issue fell outside of those categories, the refunds at issue did not have to be flowed through to customers. Id. at 1395. The court rejected that argument, stating:
 
 
 21
 A contrary ruling [that the Commission renounced its statutory power to require the refunds at issue] would inhibit the power of the regulatory agency to perform the functions Congress intended it to perform and we will not interpret the settlement agreement as tying the hands of the Commission unless--as is not the case here--the language of that agreement compels the conclusion that that is what the parties clearly intended to accomplish.... We decline to read into this settlement agreement at the behest of Texas Gas 'things which are simply not expressed or not there' [citation omitted], when to do so would tend to frustrate the Commissioner's ability to carry out the mandate of Congress.
 
 
 22
 Id. at 1395-96. See also Board of Directors and Officers, Forbes Federal Credit Union v. National Credit Union Administration, 477 F.2d 777, 784 (10th Cir.), cert. denied, 414 U.S. 924, 94 S.Ct. 233, 38 L.Ed.2d 158 (1973) (interpreting charter amendment in accordance with the Federal Credit Union Act, in part because to interpret otherwise would mean that the administrative body contracted in a manner contrary to the statute it was charged with administering).
 
 
 23
 A public body may not by contract grant to a private entity the authority to control legislative or governmental powers and functions that are delegated to it. See generally 10 McQuillin, Municipal Corporations Sec. 29.07 at 230-31 (3d ed. 1981); 73 C.J.S. Public Administrative Bodies and Procedure Secs. 57, 59 (1951 & 1982 Supp.).[4]
 
 
 24
 Beck Park overlooks the fact that this is not a private contract. Where, as here, a public interest is involved, "an interpretation is preferred which favors the public." Restatement of Contracts Sec. 236(f). Consideration of the contract against the backdrop of the National Housing Act is appropriate in these circumstances. See Rehart v. Clark, 448 F.2d 170, 173 (9th Cir.1971) (laws which exist at the time of entering into a contract form a part of the contract); Trans-Bay Engineers v. Builders, Inc. v. Hills, 551 F.2d 370, 377 (D.C.Cir.1976) (responsibilities of HUD under the National Housing Act, in addition to contracts signed by HUD, govern the rights and obligations of the parties); Maryland National Capital Park & Planning Commission v. Lynn, 514 F.2d 829, 833 (D.C.Cir.1975) (consideration of Housing Act in construing Secretary's authority proper in determining whether a grant contract was breached).
 
 
 25
 HUD's statutory power to initiate rent increases or decreases is not disputed. The Secretary could not effectively discharge the congressionally mandated duty to maintain reasonable rentals and to allow project owners a reasonable return on their investment without the power to adjust rents. Nor could HUD effectively discharge its statutory duty to base rents on operating costs without such power. Nothing in the agreement's rent increase provisions suggests that HUD renounced that power.[5]
 
 
 26
 HUD's failure to initiate rent reductions in the past does not mean that HUD forfeited or surrendered its rights. See, e.g., United States v. Weiss, 642 F.2d 296, 2907-09 (9th Cir.1981) (noting that an agency's failure to promulgate regulations pursuant to statutory authority did not destroy its authority to later promulgate the regulations because failure to act does not surrender government rights).
 
 
 27
 Even if HUD's action here was a "deviation" from past practice, it does not follow that this constitutes a breach of the agreement. The practical limitations of HUD initiating adjustments in rental schedules suggest why HUD relied on owners in the past to initiate rental increases. When faced with the impact of Proposition 13, a unique event with a large scale effect on California property owners,[6] HUD's statutory duty to maintain reasonable rentals while allowing owners a reasonable return on investment mandated that HUD initiate rent decreases where appropriate.
 
 
 28
 The fact that HUD's handbook encourages owners to decrease rents when appropriate does not preclude HUD from initiating rent reductions itself. Moreover, provisions in an agency's handbook do not have the force of law. See Rank v. Nimmo, 677 F.2d 692, 698-99 (9th Cir.1982) (citing, with approval, cases holding that HUD handbooks are merely advisory).
 
 
 29
 Beck Park also contends that HUD's reduction of rent conflicts with the agreement's scheme for allocation of rental income. Specifically, Beck Park argues that HUD's actions impaired the owners' rights to "cumulative undistributed dividends."
 
 
 30
 The agreement provides that to the extent that surplus cash is available because rental income exceeds project expenses and obligations, an owner is entitled to no more than a six percent dividend on his investment per year. Remaining surplus funds may be used to compensate owners for lack of sufficient dividends in prior years, i.e. "cumulative undistributed dividends." Any remaining income constitutes a residual receipt fund disbursed only with HUD's permission.
 
 
 31
 Beck Park argues that if HUD can initiate rent decreases at any time, then there will never be surplus funds to pay cumulative dividends.
 
 
 32
 If an owner cuts operating costs by efficient management techniques or occupancy in a particular project is greater than the projected occupancy on which the rental schedule is based, surplus funds may still be generated. Simply because HUD has the power to initiate rent decreases, it does not mean that HUD will exercise this power each time it appears, on an individual basis, that a surplus might accrue. Because of the administrative burden involved in reevaluating rents on its own initiative, this is an unlikely result. Surplus funds may still be generated on individual basis. Beck Park is really in the same position it was in before the passage of Proposition 13 with respect to the possibility that surplus funds will be sufficient to pay cumulative undistributed past dividends.
 
 C. Conclusion
 
 33
 Pursuant to the section 236 and section 221(d)(3) programs of the National Housing Act, HUD has the duty to maintain reasonable rents, based on operating costs, and to allow project owners a reasonable return on their investment. HUD's statutory power to initiate rent adjustments is necessarily implied in Congress' broad delegation of power. HUD may not contract in a way to impair the exercise of that power. Nothing in the regulatory agreement suggests that HUD did in fact renounce its statutory power.
 
 
 34
 The decision of the district court granting summary judgment for HUD on the breach of contract claims is affirmed.
 
 
 
 *
 Honorable Shiro Kashiwa, Circuit Judge, United States Court of Appeals for the Federal Circuit, sitting by designation
 
 
 [1]
 Proposition 13 (Cal. Const., art. XIII A), approved by California voters on June 6, 1978, became effective on July 1, 1978. The California Supreme Court upheld the constitutionality of Proposition 13 in Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization, 22 Cal.3d 208, 149 Cal.Rptr. 239, 583 P.2d 1281 (1978)
 
 
 [2]
 This is the language contained in the regulatory agreement of Appellant De Soto Gardens, a Sec. 221(d)(3) project owner. Because the Secretary has amended the Sec. 221(d)(3) and Sec. 236 agreements, language used in a particular appellant's agreement may differ
 
 
 [3]
 This is the language contained in the regulatory agreement of appellant Escondido Park, a Sec. 236 project owner
 
 
 [4]
 That a public body may not by contract delegate its congressionally mandated duty is implicit in cases holding that estoppel is not applicable against the Government because of unauthorized acts of its agents, at least when the Government acts in its sovereign capacity. See generally Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 383-85, 68 S.Ct. 1, 2-3, 92 L.Ed. 10 (1947) (regulation precluding insurance recovery for loss of type of wheat crop controlling, although Corporation advised the insured that his wheat was insurable and accepted his application); United States v. City and County of San Francisco, 310 U.S. 16, 28, 60 S.Ct. 749, 755-756, 84 L.Ed. 1050 (City's transfer of sale and distribution of Hetch-Hetchy power to private utility violated Congressional grant and thus city required to discontinue that course of conduct). Saulgue v. United States, 663 F.2d 968, 974-76 (9th Cir.1981) (equitable estoppel inapplicable where government acting as protector of public lands and not as a private concern)
 
 
 [5]
 Beck Park implies that to so interpret the agreement is to allow HUD to profit from an ambiguity and to not hold HUD to a standard of fair dealing. We disagree. A contract provision is ambiguous if it is reasonably susceptible of more than one meaning. Castaneda v. Dura-Vent Corp., 648 F.2d 612, 619 (9th Cir.1981). Given the language of the agreement and the statutory background, against which the agreement must be read, the agreement is not ambiguous. Because laws and regulations having the effect of laws are read into contracts to fix the right and obligation of the parties, Rehart v. Clark, 448 F.2d 170, 173 (9th Cir.1971), Beck Park was not misled by the contract's silence
 
 
 [6]
 In discussing Proposition 13, Justice Mosk noted "Although California is renowned for its earthquakes, no tremor of high Richter-scale proportion has shaken it quite like the enactment of Proposition 13." Jarvis v. Cory, 28 Cal.3d 562, 573, 170 Cal.Rptr. 11, 620 P.2d 598 (1980)