[No. D050832. Fourth Dist., Div. One. Oct. 10, 2008.]

HAROLD P. STURGEON, Plaintiff and Appellant, v.
COUNTY OF LOS ANGELES, Defendant and Respondent.

632

**COUNSEL**

Judicial Watch, Inc., Sterling E. Norris and Paul J. Orfanedes for Plaintiff and Appellant.

Jones Day, Elwood Lui, Jason C. Murray and Erica L. Reilley for Defendant and Respondent.

OPINION

**BENKE, Acting P. J.**—Section 19, article VI of the California Constitution requires that the Legislature "prescribe compensation for judges of courts of record." The duty to prescribe judicial compensation is not delegable. Thus the practice of the County of Los Angeles (the county) of providing Los Angeles County superior court judges with employment benefits, in addition to the compensation prescribed by the Legislature, is not permissible. Accordingly, we must reverse an order granting summary judgment in favor of the county in an action brought by a taxpayer who challenged the validity of the benefits the county provides to its superior court judges.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Judicial Benefits Provided by County*

Although the record is not entirely clear, it appears that at some point in the late 1980's the county began providing its superior and municipal court judges with employment benefits in addition to the salary prescribed by the Legislature. Over the years that program has been expanded and altered as the county has modified the benefits it provides its salaried employees.

Currently, the largest component of benefits provided to judges is the county's contribution to its MegaFlex Cafeteria Benefit Plan (MegaFlex). The county pays its salaried employees an amount equal to 19 percent of their monthly salary in the form of a tax-free contribution to MegaFlex. Each employee can use the county's contribution to purchase medical, dental and vision coverage or life and disability insurances. Any portion of the county's contribution that is not used to purchase benefits is paid to the employee as taxable income. The county treats its superior court judges as salaried employees of the county for the purpose of the MegaFlex contributions and thus the county's superior court judges receive MegaFlex contributions equal to 19 percent of their salary.[1]

In addition to the MegaFlex contributions, the county provides its judges with a professional development allowance (PDA). According to the county, the PDA permits judges to participate in educational and professional development programs. Each judge is given discretion in the manner in which his or her PDA is expended. In fiscal year 2007 the PDA amounted to $6,876 per judge.

---

[1] As of January 1, 2007, the Legislature set the salaries of superior court judges at $172,000. (See Gov. Code, §§ 68202, 68203 and formulas provided thereunder.) Thus for fiscal year 2007 MegaFlex benefits amounted to $32,680 per superior court judge.

The county will also match the contribution of each of its salaried employees to a "401(k)"[2] program up to 4 percent of his or her salary. In fiscal year 2007 this amounted to an additional $6,880[3] the judges were eligible to receive. Finally, the record indicates that since July 1, 1977, the judges have also received employment benefits provided by the state.

In sum, in addition to the salary, benefits and retirement prescribed by the Legislature, in fiscal year 2007 each superior court judge in Los Angeles was eligible to receive $46,436 in benefits from the county. This amount represented approximately 27 percent of their prescribed salary and cost the county approximately $21 million in fiscal 2007.

## B. *Plaintiff's Challenge*

Plaintiff and appellant Harold P. Sturgeon is a county resident and taxpayer. In April 2006 Sturgeon filed a complaint against the county under Code of Civil Procedure section 526a in which he challenged the validity of the benefits the county provided its superior court judges. Sturgeon alleged the benefits the county pays its judges are "unlawful under Cal. Const., Art. VI, §§ 19–20, Cal. Const., Art XVI, § 6, and Cal. Gov. Code § 77000, *et seq.*, among other relevant statutes and provisions of law, and constitutes an unconstitutional gift of public funds under Cal. Const., Art XVI, § 6." Sturgeon asked for declaratory and injunctive relief.

The county answered the complaint and moved for summary judgment. The county argued the benefits it provided to its judges were authorized by the Lockyer-Isenberg Trial Court Funding Act of 1997 (Lockyer-Isenberg) (Gov. Code,[4] § 77200 et seq.; Stats. 1997, ch. 850, §§ 1, 46) and therefore were neither gifts nor a waste of public funds. The county argued that even in the absence of Lockyer-Isenberg, the benefits were not gifts because, in light of the high cost of living in the Los Angeles area and the high salaries paid to lawyers in the region, the benefits were needed to attract and retain skilled and experienced judges. The county argued the Legislature's authorization of the benefits was not an impermissible delegation of the Legislature's duty to prescribe judicial compensation because the benefits were consistent with the Legislature's fundamental approach to judicial compensation and because the marketplace placed inherent limits on how much in the way of benefits the county would be willing to provide its judges.

---

[2] A "401(k)" program permits an employer and employee to make pretax contributions to an investment fund which can earn untaxed income during the employee's working years. (Int.Rev. Code, § 401(k).)

[3] See footnote 1, *ante.*

[4] All further statutory references are to the Government Code unless otherwise specified.

The trial court granted the county's motion. The court found the county's benefits contributions were neither gifts of public funds nor a waste of public funds and in fact were authorized by Lockyer-Isenberg. Sturgeon filed a timely notice of appeal.

## DISCUSSION

### I

"A defendant's motion for summary judgment should be granted if no triable issue exists as to any material fact and the defendant is entitled to a judgment as a matter of law. [Citation.] . . . We review the record and the determination of the trial court de novo." (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1002–1003 [4 Cal.Rptr.3d 103, 75 P.3d 30].)

### II

Like the trial court, we do not believe Sturgeon can establish that the benefits the county provides its judges are gifts of public funds which violate the terms of Article XVI, section 6 of our state Constitution or amount to the waste of public funds within the meaning of Code of Civil Procedure section 526a.

■ By its terms, article XVI, section 6 of the state Constitution prevents the Legislature from making or authorizing any gift of public funds for private purposes. This prohibition applies to counties and general law cities. (See *Goodall v. Brite* (1936) 11 Cal.App.2d 540, 544–545 [54 P.2d 510]; 85 Ops.Cal.Atty.Gen. 02-711 (2002).)[5] "The term 'gift' in the constitutional provision 'includes all appropriations of public money for which there is no authority or enforceable claim,' even if there is a moral or equitable obligation. [Citation.] 'An appropriation of money by the legislature for the relief of one who has no legal claim therefor must be regarded as a gift within the meaning of that term, as used in this section, and it is none the less a gift that a sufficient motive appears for its appropriation, if the motive does not rest upon a valid consideration.' [Citation.]

" 'It is well settled that the primary question to be considered in determining whether an appropriation of public funds is to be considered a gift is whether the funds are to be used for a public or private purpose. If they are to be used for a public purpose, they are not a gift within the meaning of this constitutional prohibition. [Citation.]' [Citation.]" (*Jordan v. Department of Motor Vehicles* (2002) 100 Cal.App.4th 431, 450 [123 Cal.Rptr.2d 122].) Importantly, "[t]he determination of what constitutes a public purpose is primarily a matter for the Legislature, and its discretion will not be disturbed

---

[5] The constitutional ban on gifts of public funds does not apply to charter cities. (See *Tevis v. City & County of San Francisco* (1954) 43 Cal.2d 190, 197 [272 P.2d 757]; *Los Angeles G. & E. Corp. v. Los Angeles* (1922) 188 Cal. 307, 317 [205 P. 125].)

by the courts so long as that determination has a reasonable basis. [Citations.]" (*County of Alameda v. Carleson* (1971) 5 Cal.3d 730, 746 [97 Cal.Rptr. 385, 488 P.2d 953].)

■ With respect to a public employer's provision of benefits to its employees, including bonuses for work already performed, the cases have been fairly uniform in finding that such benefits serve public rather than private purposes. In *Jarvis v. Cory* (1980) 28 Cal.3d 562 [170 Cal.Rptr. 11, 620 P.2d 598] the plaintiff challenged the Legislature's decision to award lump-sum payments to certain state employees for work performed. In rejecting the plaintiff's argument that the payments were gifts of public funds, the court stated: "[T]he Legislature found that the adjustments made by the bill were 'necessary to ensure the continued recruitment and retention of qualified and competent state employees.' We will not disturb the Legislature's finding of a public purpose so long as it has a reasonable basis. [Citation.]

"In this case, we cannot doubt the substantiality of the purpose stated. Nor can we doubt [the legislation] serves the purpose by assuring state employees they will not be abandoned in troubled times, and by raising salaries to a level more competitive with those in the private sector." (*Jarvis v. Cory, supra*, 28 Cal.3d at p. 578, fn. 10.)

In *San Joaquin County Employees' Assn., Inc. v. County of San Joaquin* (1974) 39 Cal.App.3d 83 [113 Cal.Rptr. 912] a retroactive salary increase was also challenged as a gift of public funds. In rejecting the challenge, the court stated: "It is an incontestable fact of governmental employment practices that governmental agencies must compete in the labor market with non-governmental employers. Such competition includes not only salaries but sick leave time, vacations and numerous other conditions of employment. It has been, for instance, a judicially noticeable practice of governmental agencies to correlate vacation time allowed to the years of service by an employee. . . . We cite these examples only to show that in the area of employment, public agencies must compete, and if to so compete they grant benefits to employees for past services, they are not making a gift of public money but are taking self-serving steps to further the governmental agency's self-interest in recruiting the most competent employees in a highly competitive market." (*Id.* at pp. 87–88.)

As in *Jarvis v. Cory* and *San Joaquin County Employees' Assn., Inc. v. County of San Joaquin*, here there can be little doubt the benefits that the county provides its judges enhance the recruitment and retention of judges who serve in Los Angeles. Indeed, in support of its motion for summary judgment, the county relied upon a 1988 report on judicial compensation that found judicial salaries were not by themselves sufficient incentive to retain or recruit judges in the Los Angeles area. Thus, as in *Jarvis v. Cory* and *San Joaquin County Employees' Assn., Inc. v. County of San Joaquin*, the benefits

the county provides promote the public interest in recruiting and retaining high caliber judicial officers and therefore are not gifts within the meaning of article XVI, section 6 of the Constitution.

For much the same reason we must reject Sturgeon's contention that the benefits constitute waste within the meaning of Code of Civil Procedure section 526a. " '[T]he term "waste" as used in section 526a means something more than an alleged mistake by public officials in matters involving the exercise of judgment or wide discretion. To hold otherwise would invite constant harassment of city and county officers by disgruntled citizens and could seriously hamper our representative form of government at the local level. Thus, the courts should not take judicial cognizance of disputes which are primarily political in nature, nor should they attempt to enjoin every expenditure which does not meet with a taxpayer's approval. On the other hand, a court must not close its eyes to wasteful, improvident and completely unnecessary public spending, merely because it is done in the exercise of a lawful power.' [Citation.]" (*Sundance v. Municipal Court* (1986) 42 Cal.3d 1101, 1138–1139 [232 Cal.Rptr. 814, 729 P.2d 80].)

In *County of Ventura v. State Bar* (1995) 35 Cal.App.4th 1055, 1059–1060 [41 Cal.Rptr.2d 794], the court, in discussing the propriety of Ventura County's payment of the noncompulsory portion of its attorney bar dues, stated: "The proper question in reviewing a perquisite of employment for waste of public funds is whether the perquisite is necessary or useful or provides a benefit to the public agency. [Citation.] Normally the answer will be yes. Payment for a non-essential perquisite—such as vision care insurance, a private office, or a decent desk chair—benefits the public agency in that, *as part of an overall employee benefits package*, it helps attract and keep superior employees. Such expenditures are beneficial, useful, and as a practical matter necessary to the staffing of a high quality office of public attorneys." (Fn. omitted.)

In this regard we recognize that the Legislature, by way of Lockyer-Isenberg, has assumed responsibility for trial court funding. (§ 77200.) However, even following Lockyer-Isenberg, counties still have a continuing legitimate interest in assuring that the judges who administer justice to their residents are competent and skilled.[6] Because they improve recruitment and retention of judicial officers, the disputed benefits the county provides serve a public purpose and thereby defeat Sturgeon's waste theory as well as his gift of public funds contention.

---

[6] Because the benefits the county provides its judges promote the administration of justice within the county, this case is not subject to the holding in *City of Ceres v. City of Modesto* (1969) 274 Cal.App.2d 545, 555–556 [79 Cal.Rptr. 168].

## III

We also agree with the trial court that nothing in Lockyer-Isenberg prevents the county from providing its judges with the disputed benefits, and in fact Lockyer-Isenberg appears to contemplate payment of such benefits by the county.

Section 2 of Lockyer-Isenberg states in pertinent part: "The Legislature finds and declares . . . . [¶] . . . [¶] (f) It is increasingly clear that the counties of California are no longer able to provide unlimited funding increases to the judiciary and, in some counties, financial difficulties and strain threaten the quality and timeliness of justice." (Stats. 1997, ch. 850, § 2.) In section 3 the Legislature declared its intention to: "(a) Provide state responsibility for funding of trial court operations commencing in the 1997–98 fiscal year. [¶] (b) Provide that county contributions to trial court operations shall be permanently capped at the same dollar amount as that county provided to court operations in the 1994–95 fiscal year with adjustments to the cap, as specified. [¶] (c) Provide that the State of California shall assume full responsibility for any growth in costs of trial court operations thereafter." (Stats. 1997, ch. 850, § 3.) Importantly, section 3, subdivision (g) of the act states: "In adopting this plan, the Legislature intends . . . : [¶] (1) To provide that no personnel employed in the court system as of July 1, 1997, shall have their salary or benefits reduced as a result of this act."

The Legislature effected its intention of relieving counties of any increases in the costs of operating courts by requiring that, in fiscal year 1998, each county submit to the Department of Finance an annual "maintenance of effort payment" (MOE) which was set at the amount each county paid in the 1994–1995 fiscal year for court operations. (§ 77201, subd. (b)(1).) Of some relevance here, the Legislature permitted counties to deduct from their 1998 MOE payments the amount of benefits they provided to judges in the 1994–1995 fiscal year. (§ 77201, subd. (c)(1).) Under section 77201, subdivision (c)(1), counties were required to "submit a declaration to the Department of Finance . . . that the amount it is required to submit to the state . . . either includes or does not include the costs for local judicial benefits . . . . Upon verification that the amount the county is required to submit to the state includes the costs of local judicial benefits, the department shall reduce . . . the amount the county is required to submit to the state . . . in which case the county shall continue to be responsible for the cost of those benefits." In the event there was any dispute with the Department of Finance as to the amount of either the MOE or the deduction for judicial benefits, the counties were permitted to ask for an audit by the Controller. (§ 77201, subds. (c), (d).)[7]

---

[7] We take judicial notice of the documents setting forth the MOE that counties provided the state in 1998 and the MOE submitted by the county on July 9, 2008.

Contrary to Sturgeon's contention, the deduction for judicial benefits permitted under section 77201, subdivision (c)(1), was not limited to deductions from the MOE due for fiscal 1998. By way of section 77201.1 the Legislature reduced each county's respective MOE for each year after fiscal 1998 and, in section 77201.1, subdivision (b)(4), expressly continued the adjustments permitted by section 77201, subdivision (c).

 Although section 77201, subdivision (c), permitted counties to request an audit in the event there was any dispute as to the amount of the adjustment for judicial benefits, such an audit was not required in order to make the adjustment. Thus contrary to Sturgeon's alternative argument, the reference in section 77201.1, subdivision (b)(4), to the procedures set forth in section 77201, subdivision (c), including in particular the audit procedures, cannot be read as limiting the judicial benefits adjustment to counties which in fact requested an audit. As the trial court noted, such a reading of the statutes would have required a county to request an audit even when the Department of Finance did not challenge the amount the county submitted in its declaration. We cannot adopt a statutory construction which would lead to such an absurd consequence. (See *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].)

For our purposes the most significant aspect of Lockyer-Isenberg is what is *not* in the act: nothing on the face of the statute prevents a county from continuing to provide judicial benefits, such as those the county provides its judges. The provisions of Lockyer-Isenberg that the parties have vigorously disputed—the circumstances under which a county may receive an adjustment of its MOE for the payment of such benefits—do not directly impact Sturgeon's claims. Even if Lockyer-Isenberg did not provide for an adjustment for judicial benefits, the statute would not otherwise prevent payment of the benefits by the county. Rather, in the absence of the adjustments allowed by sections 77201, subdivision (c), and 77201.1, the cost of the benefits would be borne entirely by the county.

Although the adjustment provisions of Lockyer-Isenberg do not directly impact Sturgeon's claims, they are relevant in that they support the county's contention that the Legislature was well aware of the benefits the county provides and, in permitting the adjustments, expressly approved those benefits. This inference is of course buttressed by the express statement in section 3 of Lockyer-Isenberg that the Legislature intended that no court personnel suffer any reduction in salary or benefits. The inference is also supported by the provisions of section 69894.3, which was enacted in 1959 and provides in pertinent part: "Employees of the superior court in each county having a population of over 2,000,000 shall be entitled to step advancement, vacation, sick leave, holiday benefits and other leaves of absence and other benefits as

may be directed by rules of the court. Where statutes require implementation by local ordinances for the extension of benefits to local officers and employees, these may be made applicable by rule to court personnel, including but not limited to jurors, and judges." Los Angeles Local Rule 1.12 in turn provides: "In accordance with Government Code section 69894.3 all County of Los Angeles benefits extended to employees and local officers by local ordinance are applicable to Superior Court of California, County of Los Angeles, personnel, jurors and judges." (Super. Ct. L.A. County, Local Rules, rule 1.12; see also § 53200.3.)

■ In sum, Lockyer-Isenberg does not prevent payment of judicial benefits beyond the compensation set by the Legislature but rather, under any fair reading of the act, authorizes them.

## IV

■ The fact the Legislature appears to have authorized the benefits by way of Lockyer-Isenberg does not end our inquiry. Section 19, article VI of the California Constitution requires that the Legislature "*prescribe* compensation for judges of record." (Italics added.) In *Sevier v. Riley* (1926) 198 Cal. 170, 174–175 [244 P. 323], the court interpreted the precursor to this portion of section 19, article VI, and stated: "There is no room for doubt as to the interpretation to be given to this clause in said amendment to the constitution, since it makes manifest as clearly and tersely as words could do the intent of the framers thereof that the entire matter of the compensation of justices and judges of courts of record in this state, both as to the amount thereof and as to the time and manner of payment thereof, should be transferred from the constitution and reposed in the legislature. This is made all the more manifest when we take note of the meaning of the word '*prescribed*' as employed therein. The term 'prescribe' is defined by the lexicographers as meaning, 'To lay down authoritatively as a rule of action; to ordain, appoint, define authoritatively.' (Century Dictionary.) 'To lay down authoritatively as a guide, direction, or rule of action; to impose as a peremptory order; to dictate, appoint, direct, ordain.' " In *Sevier v. Riley, supra*, at pages 174–175, the court considered a previously adopted constitutional limitation on the Legislature's ability to increase salaries and noted the substantial disparities it created among the salaries that could be paid to judges in various counties. The court found, in light of the clear intention of the amendment to give the Legislature unfettered authority over judicial compensation, that limitation was repealed by implication. (*Id.* at p. 176.)

### A. *Attorney General Opinions*

In two opinions the Attorney General has concluded that in light of section 19, article VI, counties may not lawfully provide superior court judges with

the same employment benefits they provide their own employees. (See 59 Ops.Cal.Atty.Gen. 496, 501 (1976); 61 Ops.Cal.Atty.Gen. 388, 390 (1978).) In the Attorney General's first opinion he analyzed the then current version of Government Code section 53200.3. By way of sections 53200–53210 the Legislature authorized local governments, including counties, to provide health and welfare benefits to their officers and employees. In section 53200.3 the Legislature further provided: "For the limited purpose of the application of this article, judges of the superior and municipal courts and the officers and attaches of said courts whose salaries are paid either in whole or in part from the salary fund of the county are county employees." (Stats. 1957, ch. 472, § 1, p. 1508.) In finding this provision unconstitutional, the Attorney General noted that a duty which is prescribed by the Constitution is a nondelegable duty. (59 Ops.Cal.Atty.Gen., *supra*, at p. 497; see also *County of Madera v. Superior Court* (1974) 39 Cal.App.3d 665, 670, fn. 3 [114 Cal.Rptr. 283].) Thus the Attorney General noted any attempt to delegate such a duty would be unconstitutional. (59 Ops.Cal.Atty.Gen., *supra*, at p. 497.) The Attorney General, based on his prior opinions and on legislative reports on the issue, further concluded employee benefits were part of an employee's compensation. (*Ibid.*)

The Attorney General noted a legislative body may give another administrative body the power to determine facts subject to a rule or standard determined by the Legislature and thereby avoid an improper delegation of its power. (59 Ops.Cal.Atty.Gen, *supra*, at p. 500.) "Several equally well established principles, however, serve to limit the scope of the doctrine proscribing delegations of legislative power. For example, legislative power may properly be delegated if channeled by a sufficient standard." (*Kugler v. Yocum* (1968) 69 Cal.2d 371, 375–376 [71 Cal.Rptr. 687, 445 P.2d 303]; see also *Blumenthal v. Board of Medical Examiners* (1962) 57 Cal.2d 228, 235 [18 Cal.Rptr. 501, 368 P.2d 101].) However, the Attorney General concluded the power channeled to the counties by section 53200.3 "is totally without standards and thus would not satisfy this requirement set forth in *Kugler*." (59 Ops.Cal.Atty.Gen., *supra*, at p. 500.)

In response to the Attorney General's first opinion, the Legislature amended section 53200.3 by adding to the first sentence of the statute the phrase "and shall be subject to the same or similar obligations and be granted the same or similar employee benefits as are now required or granted to employees of the county in which the court of said judge, officer, or attaché is located." (Stats. 1977, ch. 106, § 1, p. 537.) In his second opinion the Attorney General found the amended statute was invalid for the same reason the original statute was defective: "[A]s was the case prior to the amendment, the Legislature authorizes the individual county legislative bodies to determine if, and in what form, and to what extent judges shall be compensated

with county-sponsored health insurance benefits. [Citation.] There is a complete absence of effective legislatively established standards to guide county authorities in the making of this determination. The Legislature has thus failed to address itself to those omissions that caused the original statute to be constitutionally defective." (61 Ops.Cal.Atty.Gen., *supra*, at p. 390.)

B. *Section 1241*

■ The county asks that we reject the Attorney General's opinions. In particular, the county argues the Attorney General erred in concluding employee benefits are part of judicial compensation within the meaning of section 19, article VI of the California Constitution. The county relies on the Legislature's enactment in 1987 of section 1241, which states: "Whenever a section of the California Constitution uses both the terms 'salary' and 'compensation,' with respect to a public officer or employee, the terms shall be construed to apply only to salary." The legislative history of section 1241 indicates it was enacted as a means of excluding employee benefits from the term "compensation" wherever the terms "compensation" and "salary" appeared in a single provision of the Constitution. (See Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 1357 (1987–1988 Reg. Sess.) Sept. 10, 1987; Off. of Local Government Affairs, Enrolled Bill Rep. on Sen. Bill No. 1357 (1987–1988 Reg. Sess.) Sept. 22, 1987, p. 1.) By its terms, section 1241 applies to section 19, article VI, because the second paragraph of the constitutional provision prevents any judge from receiving his or her "salary" if any matter before the judge has been pending more than 90 days.

■ We recognize we owe deference to interpretations of constitutional provisions enacted by the Legislature. (See *Methodist Hosp. of Sacramento v. Saylor* (1971) 5 Cal.3d 685, 693 [97 Cal.Rptr. 1, 488 P.2d 161]; *San Francisco v. Industrial Acc. Com.* (1920) 183 Cal. 273, 279 [191 P. 26].) However, such a legislative construction is only permitted "[i]f the terms of a statute are by fair and reasonable interpretation capable of a meaning consistent with the . . . Constitution." (*County of Los Angeles v. Legg* (1936) 5 Cal.2d 349, 353 [55 P.2d 206].)

Our consideration of the express language of section 19, article VI of the state Constitution, its origins and purposes and the potential consequences of adopting a narrow interpretation of its scope, convince us that notwithstanding section 1241, the employment benefits provided by the county are part of each judge's compensation and therefore must be prescribed by the Legislature.

1. *Constitutional Interpretation*

■ "The principles of constitutional interpretation are similar to those governing statutory construction. In interpreting a constitution's provision,

our paramount task is to ascertain the intent of those who enacted it. [Citation.] To determine that intent, we 'look first to the language of the constitutional text, giving the words their ordinary meaning.' [Citation.] If the language is clear, there is no need for construction. [Citation.] If the language is ambiguous, however, we consider extrinsic evidence of the enacting body's intent. [Citations.]" (*Thompson v. Department of Corrections* (2001) 25 Cal.4th 117, 122 [105 Cal.Rptr.2d 46, 18 P.3d 1198].) In interpreting constitutional provisions, courts have relied on such extrinsic evidence as ballot materials and contemporaneous interpretations by the Legislature and administrative agencies. (See, e.g., *Silicon Valley Taxpayers' Assn., Inc. v. Santa Clara County Open Space Authority* (2008) 44 Cal.4th 431, 444–445 [79 Cal.Rptr.3d 312, 187 P.3d 37]; *ITT World Communications, Inc. v. City and County of San Francisco* (1985) 37 Cal.3d 859, 869 [210 Cal.Rptr. 226, 693 P.2d 811].)

### 2. *Express Language*

■ The ordinary and common understanding of the word "compensation" is broad, unrestricted and encompassing: "[S]*omething* given or received as an equivalent for services, debt, loss, injury, suffering lack, etc." (Random House Dict. of the English Language (2d ed. 1987) p. 417, italics added.) "*Something* given or received as an equivalent or as reparation for a loss, service, or debt; a recompense; an indemnity." (American Heritage Dict. of the English Language (1976) p. 271, italics added.) "[P]ayment for value received or service rendered: REMUNERATION." (Webster's 3d New Internat. Dict., Unabridged (2002) p. 463.) "Remunerate" itself is defined as: "[T]o pay, recompense, or reward for work, trouble, etc." (Random House Dict. of the English Language, *supra*, at p. 1630.) Importantly, in its common understanding the term "compensation" is not restricted to any particular method or mode of payment: "[T]he ordinary meaning of the term 'compensation,' as applied to officers, is remuneration *in whatever form it may be given, whether it be salaries and fees, or both combined.*" (*State v. Bland* (1913) 91 Kan. 160, 167 [136 P. 947, 949], italics added, cited by Black's Law Dict. (rev. 4th ed. 1968) p. 354.)

Although in many contexts "salary" is used interchangeably with "compensation" (see, e.g., *Sevier v. Riley, supra*, 198 Cal. at pp. 172–173; *Martin v. Santa Barbara* (1894) 105 Cal. 208, 212–214 [38 P. 687]), "salary" is usually defined somewhat more narrowly than compensation. "[S]alary . . . a fixed compensation periodically paid to a person for regular work or services." (Random House Dict. of the English Language, *supra*, at p. 1693.) "A fixed compensation for services, paid to a person on a regular basis." (American Heritage Dict. of the English Language, *supra*, at p. 1144.) "[F]ixed compensation paid regularly (as by the year, quarter, month, or

week) for services." (Webster's 3d New Internat. Dict., Unabridged, *supra*, at p. 2003.) "Salary: . . . In a more limited sense a fixed periodical compensation paid for services rendered; a stated compensation, amounting to so much by the year, month, or other fixed period, to be paid to public officers and persons in some private employments, for the performance of official duties or the rendering of services of a particular kind, more or less definitely described, involving professional knowledge or skill, or at least employment above the grade of menial or mechanical labor." (Black's Law Dict., *supra*, at p. 1503.)

Still narrower than "compensation" or "salary" is the related term "wages." "Wages" are: "money that is paid or received for work or services, as by the hour, day, or week." (Random House Dict. of the English Language, *supra*, at p. 2136.) Alternatively, a "wage" is "[p]ayment for services to a workman; usually, remuneration on an hourly, daily, or weekly basis or by the piece." (American Heritage Dict. of the English Language, *supra*, at p. 1440.) Significantly, "wage" has also been defined as "a pledge or payment of . . . monetary remuneration by an employer . . . for labor or services . . . according to contract and on an hourly basis and *often including bonuses, commissions, and amounts paid by the employer for insurance, pension, hospitalization, and other benefits*." (Webster's 3d New Internat. Dict., Unabridged, *supra*, at p. 2568.)

Given the breadth of the term "compensation," any common understanding of it includes the employment benefits the county provides its judges. In this regard it is significant for us that, in a host of cases that have arisen since the middle of the last century, when such benefits became relatively commonplace, courts have uniformly determined such benefits are part of an employee's compensation, salary or wages. In *Wise v. Southern Pac. Co.* (1970) 1 Cal.3d 600, 607 [83 Cal.Rptr. 202, 463 P.2d 426], the defendant in a wrongful discharge case argued that, because under its collective bargaining agreement it was only required to pay an unfairly dismissed employee his lost "wages," the plaintiff should not have been provided a recovery which included the cost of replacing his fringe benefits. In rejecting this argument, the court stated: "[E]ven if it be assumed without deciding that the contract could properly limit plaintiff's damages to the extent and in the respect for which defendant contends, it is our view that in an action for wrongful discharge, and pursuant to the present day concept of employer-employee relations, the term 'wages' should be deemed to include not only the periodic monetary earnings of the employee but also the other benefits to which he is entitled as a part of his compensation." (*Ibid.*)

In *Ware v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1972) 24 Cal.App.3d 35, 44 [100 Cal.Rptr. 791], the plaintiff argued amounts due

under the terms of his employer's profit-sharing plan were part of his wages within the meaning of Labor Code section 229, which prevented employers from compelling arbitration of wage disputes. In agreeing with the plaintiff and finding the plaintiff's claim to amounts due under the profit-sharing plan were not subject to arbitration, the court stated: "In its legal sense, the word 'wage' has been given a broad, general definition so as to include compensation for services rendered without regard to the manner in which such compensation is computed." (24 Cal.App.3d at p. 44.)

In *Foremost Dairies v. Industrial Acc. Com.* (1965) 237 Cal.App.2d 560, 579 [47 Cal.Rptr. 173], the court rejected an employer's contention it should receive a credit against its workers' compensation liability to an injured worker for amounts paid on behalf of the worker by an employer-funded health plan. The court rejected the claim because it determined the benefits, whether funded by the employee or the employer, were part of the employee's wages: "The record discloses that the policy was provided by the employer as a fringe benefit to the employee and as such formed a portion of the wages paid to decedent as an employee. Thus, in effect, the employee paid the premiums. The result is the same whether the employer paid the premiums as an employment benefit to the employee or whether he paid the employee direct and the employee procured his own private medical insurance." (*Ibid.*)

In *Martin v. City & County of S. F.* (1959) 168 Cal.App.2d 570, 574–576 [336 P.2d 239], the court was called upon to interpret a city charter provision which required certain skilled workers receive the same "rate of pay" as their counterparts in the private sector. In the private sector those workers received an hourly wage plus health benefits. The court found the city could not deduct the cost of the workers' health benefits without diminishing their rate of pay. "[I]t is clear that in the instant case the plaintiffs were not receiving the same 'take home pay' as their counterparts in private industry, because of the compulsory deduction by the employer for the city's health plan." (*Id.* at p. 578.)

The holding and rationale in *People v. Alves* (1957) 155 Cal.App.2d Supp. 870, 871–872 [320 P.2d 623], has additional import here because in that case the court found health and welfare benefits were wages within the meaning of our Constitution. In *People v. Alves* the defendant was charged with a misdemeanor violation of the Labor Code for failing to pay the benefits required under a collective bargaining agreement. The defendant argued that under our Constitution he could not be imprisoned for debt. (See Cal. Const., former art. I, § 15.) In rejecting the defendant's argument, the court noted an employer's liability for wages was not a debt subject to the constitutional proscription against imprisonment for debt, and criminal liability could be imposed for failure to pay wages. The court then found the health and welfare benefits

were part of an employee's wages within the meaning of the Constitution. "There is no doubt that payments to a health or welfare fund made as part of the compensation for services rendered by employees are wages as that word is used in the foregoing [case]." (*People v. Alves, supra,* 155 Cal.App.2d at p. Supp. 872.)

We agree with the county's contention that at the time the predecessor of section 19, article VI of the state Constitution, was adopted by voters in 1924, employment benefits such as the ones the county provides were not as commonplace as they are today. However, they were not entirely unknown. For instance, in 1889 the Legislature adopted "An Act to create a Police Relief, Health, and Life Insurance and Pension Fund in the several counties, cities and counties, cities, and towns of the State." (Stats. 1889, ch. 62, p. 56.) It provided police officers in the state with a pension as well as disability and death benefits. Moreover, in the late 19th and early 20th centuries the term "compensation" was, as it is today, interpreted broadly rather than narrowly. (See, e.g., *State v. Bland, supra,* 136 P. at p. 949; *Western Metal Supply Co. v. Pillsbury* (1916) 172 Cal. 407 [156 P. 491]; *Martin v. Santa Barbara, supra,* 105 Cal. at pp. 212–213.)

In addition to the fact that employment benefits somewhat similar to those provided by the county existed in limited areas of the employment market in 1924 when the predecessor of section 19, article VI of the state Constitution was adopted, we note such benefits were widespread in 1966 when the Legislature placed on the ballot, and the voters adopted, as part of the comprehensive revision of the Constitution, section 19, article VI, as it now appears. The drafters of the 1966 Constitution certainly were aware both that employers provided such benefits and that courts consistently found such benefits were part of an employee's wages or salary.

In sum, the term "compensation" is itself broad, and courts have had no difficulty over the last more than half-century in repeatedly finding employment benefits such as the county provides are part of the relatively narrower terms "wages" or "rate of pay." Moreover, during that period of time, when such employment benefits became more commonplace, the people readopted the broad language which now appears in section 19, article VI of the state Constitution. Under these circumstances, where the plain meaning of the Constitution appears to clearly encompass the benefits in dispute, arguably our analysis is complete. (See *ITT World Communications, Inc. v. City and County of San Francisco, supra,* 37 Cal.3d at p. 868.) However, in an abundance of caution, we will nonetheless consider whether any variance from that plain meaning can be found in either the history surrounding the limitation or any manifestation of its underlying purposes. (*Ibid.*)

### 3. *Judicial Compensation*

The ballot materials with respect to both the 1924 amendment to the state Constitution which initially gave the Legislature the responsibility for setting judicial compensation and to the 1966 revision which readopted that delegation of responsibility do not discuss judicial compensation. Admittedly, we do have, in section 1241, the Legislature's interpretation of compensation. However, as the court noted in *City and County of San Francisco v. County of San Mateo* (1995) 10 Cal.4th 554, 563 [41 Cal.Rptr.2d 888, 896 P.2d 181], it is *contemporaneous* constructions by the Legislature which are persuasive in interpreting ambiguous provisions of our Constitution. (See also *Board of Supervisors v. Lonergan* (1980) 27 Cal.3d 855, 863 [167 Cal.Rptr. 820, 616 P.2d 802].) The 1988 enactment of section 1241 was by no means contemporaneous with either the 1924 adoption of an amendment giving the Legislature the obligation of prescribing compensation or with the 1966 reenactment of that provision as part of the comprehensive revision of the Constitution.[8] Thus we turn to the historical origins of the term "compensation" as it has been used with respect to the judiciary.

Concern over judicial compensation existed at the time the federal Constitution was adopted. The federal Constitution's compensation clause guarantees federal judges a "Compensation, which shall not be diminished during their Continuance in Office." (U.S. Const., art. III, § 1.) "[T]he Compensation Clause, along with the Clause securing federal judges appointments 'during good Behavior,' U.S. Const., Art. III, § 1—the practical equivalent of life tenure—helps to guarantee what Alexander Hamilton called the 'complete independence of the courts of justice.' The Federalist No. 78, p. 466 (C. Rossiter ed. 1961). Hamilton thought these guarantees necessary because the Judiciary is 'beyond comparison the weakest of the three' branches of Government. *Id.*, at 465–466. It has 'no influence over either the sword or the purse.' *Id.*, at 465. It has 'no direction either of the strength or of the wealth of the society.' *Ibid.* It has 'neither FORCE nor WILL but merely judgment.' " (*United States v. Hatter* (2001) 532 U.S. 557, 567–568 [149 L.Ed.2d 820, 121 S.Ct. 1782].)

The drafters of our 1849 state Constitution went further in protecting judicial independence by not only limiting the power of the Legislature to reduce the compensation of judges during their respective terms of office, but also in preventing the Legislature from raising judges' compensation. Article VI, section 15 of the 1849 Constitution provided judges shall "receive for

---

[8] We also note the legislative history of section 1241 suggests the most immediate concern of the Legislature was application of the limitation on legislative compensation set forth in former article IV, section 4 of the Constitution. The limitation on legislative compensation was added to the Constitution in 1966 and was deleted from the Constitution in 1990.

their services a compensation . . . which shall not be increased or diminished during the term for which they shall have been elected." The drafters of the 1879 Constitution carried this limitation forward. (See Cal. Const. of 1879, art. VI, § 17.) In addition to continuing this limitation, the drafters of the 1879 Constitution added a separate provision which stated: "No Judge of a Superior Court nor of the Supreme Court shall, after the first day of July, one thousand eight hundred and eighty, be allowed to draw or receive any monthly salary unless he shall take and subscribe an affidavit before an officer entitled to administer oaths, that no cause in his Court remains undecided that has been submitted for decision for the period of ninety days." (Cal. Const. of 1879, art. VI, § 24.)

In 1906 the judicial compensation provision of the 1879 Constitution, article VI, section 17, was amended. (Stats. 1909, p. xxxiv.) Under the 1906 amendment, the compensation of justices of the Supreme Court and Courts of Appeal were set by the Constitution itself at annual salaries of $8,000 and $7,000 respectively. (*Ibid.*) With respect to the superior court judges, the amended version of section 17 provided: "The salaries of the Judges of the Superior Court, in all counties having but one judge, and in all counties in which the terms of the Judges of the Superior Court expire at the same time, shall not hereafter be increased or diminished after their election, nor during the term for which they shall have been elected." (*Ibid.*) As the court in *Sevier v. Riley* explained, this limitation on judicial salaries combined with the Legislature's addition of new judges in various counties created some disparity among the salaries paid to superior court judges: "[T]he state legislature, responding to the demands of the more populous counties of California, due to their increase in population and corresponding increase in litigation, adopted various enactments increasing, and in some counties again and again increasing, the number of superior judges assigned to such regions, and in so doing provided for the expiration of the terms of these additional judicial officers at different times from that of those holding office under previous conditions of the law. The result of these changes in the statutes, especially since 1906, has been that of enabling a goodly number of the counties of the state to be exempted from the constitutional inhibition against an increase in the salaries of their superior judges to become effective during their respective terms of office, by the simple expedient of adding one or more to the number of their superior judges with terms expiring at different times than those already provided. The result of these changes in the constitution and statutes prior to and up to the year 1924 was this: that as to the supreme and appellate justices the salaries of these, both as to the amount and payment thereof, were rigidly fixed by the terms of section 17 of article VI of the constitution; that as to superior judges the salaries of these were subject to fixation by the legislature, limited by the provision in said section 17 of article VI of the constitution to the effect that in counties having but one

superior judge, or, if more, having the terms of these expiring at the same time, there should be no legislative increase in the salaries of these one or more judges which could become effective during their terms of office; while as to counties which had by legislative action effected an increase in the number of their judges so worded as to make the terms of their judgeships expire at different times, the constitutional inhibition was inapplicable and that the increases in such salaries as the legislature from time to time provided for in such counties became effective immediately." (*Sevier v. Riley, supra*, 198 Cal. at pp. 173–174.)

In 1924 the voters approved a number of amendments to the Constitution, including an amendment establishing the municipal courts. In addition to establishing municipal courts, the amendment added the following language to section 11, article VI: "The compensation of the justices or judges of all courts of record, shall be fixed and the payment thereof prescribed by the legislature." (Stats. 1925, p. xxv.) Although the amendment adopting this provision did not expressly repeal the limitations of former section 17, article VI, in *Sevier v. Riley* the court found those limitations had by implication been repealed. The court found retention of the earlier limitations "would be hostile to the spirit and intent of the amendment in so far as the latter was designed to commit the matter of judicial salaries in all these various courts of record to the flexible control of the legislature rather than to the rigid limitations of the constitution . . . ." (*Sevier v. Riley, supra*, 198 Cal. at p. 176.)

In 1966 the Constitution was once again revised, and section 19, article VI, was adopted in its current form. The first sentence of section 19, article VI, is derived from former section 11, article VI, and the second sentence is the same language which appeared in former section 24, article VI of the Constitution.[9]

Nothing in the foregoing history of section 19, article VI, suggests that at any time since the term "compensation" was first used in the Constitution in 1849 did the drafters intend that it have a narrow or constrained meaning. Rather, it is clear that while the drafters of the 1849 and 1879 Constitutions were, like the drafters of the federal Constitution, concerned about protecting judges from political influence, in 1924 those concerns gave way to a concern that judges be paid on some rational and relatively uniform basis. Neither the

---

[9] We note that in 1972 the voters adopted Proposition 6, which added article III, section 4 to the Constitution. As initially adopted, article III, section 4, stated: "Salaries of elected state officers may not be reduced during their term of office. Laws that set these salaries are appropriations." In 1980 article III, section 4, was amended to permit the Legislature to terminate prospective, but unrealized, increases in salaries. Neither Sturgeon, nor the county, has relied upon or briefed article III, section 4, and we express no opinion on it with respect to the issues raised in this appeal or that may be raised in the future, including the rights of others to intervene in this litigation.

need to provide protection from political influence nor the desire to give the Legislature plenary power over compensation as a means of promoting rationality and uniformity support a narrow reading of the term "compensation."

### 4. The County's Judicial Benefits

On this record, notwithstanding section 1241, the benefits the county provides to judges are compensation within the meaning of section 19, article VI of the state Constitution. The MegaFlex benefits provided by the county equal 19 percent of a judge's salary, and judges may elect to receive that benefit in cash as taxable income. The judges are not limited in the manner in which they choose to use their respective PDA's and, if they are willing to suffer the adverse tax consequences, they can have access to their 401(k) accounts. Thus the judges have a great deal of control over the benefits once they are paid. We also note that the county, in opposing Sturgeon's gift and waste theories, made a convincing case both in the trial court and here on appeal that the benefits were needed for recruitment and retention. In this factual context, any common understanding of the term "compensation" would include these benefits because of the judge's access to them once they are paid and because of the purpose they serve.

In addition, we believe the benefits are compensation within the meaning of the Constitution because collectively the benefits substantially increase the amount Los Angeles judges receive for their services. The size of the benefits and the resulting potential for disparity with the remuneration paid to judges in other counties directly implicate the very reasons the Legislature was given plenary power over judicial compensation by way of adoption of the precursor to section 19, article VI. (See *Sevier v. Riley, supra,* 198 Cal. at pp. 174–175.)

### C. Prescribed Compensation

The county also argues that even if the judicial benefits it provides are compensation within the meaning of section 19, article VI of the Constitution, the Legislature has adequately prescribed those benefits. As we explain more fully below, we do not find any statutory provision or other enactment which meets the requirements of the Constitution.

### 1. Prescribed Duties

When the Constitution has "prescribed" a duty "the named authority must itself exercise the function described; in other words, it imposes a nondelegable duty. The more general term 'provide' is used when it is intended not to require action by the named authority itself; in other words, it permits the

delegation of the function to others." (Judicial Council of Cal., Ann. Rep. (1967) pp. 65, 67, fn. omitted; see also *Sevier v. Riley, supra,* 198 Cal. at pp. 174–175; *County of Madera v. Superior Court, supra,* 39 Cal.App.3d at pp. 669–670.) Importantly, even when a legislative body bears a nondelegable duty, it may nonetheless permit other bodies to take action based on a general principle established by the legislative body so long as the Legislature provides standards or safeguards which assure that the Legislature's fundamental policy is effectively carried out. (*Kugler v. Yocum, supra,* 69 Cal.2d at pp. 376–377.) "We have said that the purpose of the doctrine that legislative power cannot be delegated is to assure that 'truly fundamental issues [will] be resolved by the Legislature' and that a 'grant of authority [is] . . . accompanied by safeguards adequate to prevent its abuse.' [Citations.] This doctrine rests upon the premise that the legislative body must itself effectively resolve the truly fundamental issues. It cannot escape responsibility by explicitly delegating that function to others or by failing to establish an effective mechanism to assure the proper implementation of its policy decisions." (*Ibid.*)

In *Kugler v. Yocum, supra,* 69 Cal.2d 371, the court considered a proposed ordinance which set the minimum salary of firefighters in the City of Alhambra by reference to the average pay of firefighters in the City of Los Angeles. "In the instant case, the adoption of the proposed ordinance, either through promulgation by the Alhambra City Council or by initiative, will constitute the legislative body's resolution of the 'fundamental issue.' Once the legislative body has determined the issue of policy, i.e., that the Alhambra wages for firemen should be on a parity with Los Angeles, that body has resolved the 'fundamental issue'; the subsequent filling in of the facts in application and execution of the policy does not constitute legislative delegation. Thus the decision on the legislative policy has not been delegated; the implementation of the policy by reference to Los Angeles salaries is not the delegation of it." (*Id.* at p. 377.) The court found the proposed ordinance would not have unlawfully delegated Alhambra's lawmaking function to another body because of the inherent interest of Los Angeles in not paying excessive salaries. (*Id.* at p. 382.)

The court reached a similar conclusion in *Martin v. County of Contra Costa* (1970) 8 Cal.App.3d 856, 860–862 [87 Cal.Rptr. 886] (*Martin*). In *Martin* the court approved legislation which set the salary of municipal court attachés in Contra Costa County at the same rate as comparable county employees and expressly provided the court employees would be entitled to the same raises as their counterparts in the county. In finding the Legislature met its constitutional obligation to prescribe the salaries of municipal court attachés by tying their salaries and benefits to those of other county employees, the court stated: "This provision is not an abdication of the Legislature's duty to prescribe the compensation of the attaches of each municipal court. It fixes the compensation of the employees, declares a policy that such compensation

shall be commensurate with that furnished county employees with equivalent responsibilities and provides for interim changes, subject to review by the Legislature, in the event there are local changes which would otherwise cause discrepancies in compensation in violation of the legislative policy." (*Id.* at p. 862.)

### 2. *Constitutional Considerations*

In the context of judicial compensation, we must carefully observe the limits of legislative delegation. As we have seen, early drafters of our Constitution were concerned about protecting the judicial branch from excessive and improper political influence, and they imposed rigid limits on judicial compensation. In the interests of bringing rationality and uniformity to judicial compensation, the responsibility of protecting the judiciary has now been left largely in the hands of the Legislature. Because the legislative responsibility with respect to judicial compensation, including of necessity the participation of the executive branch in the legislative process, is now the principal means of protecting the independence of the judicial branch,[10] in considering compensation judges receive, we must be careful that in fact the Legislature has exercised its prescriptive role. In particular, unlike the concern employees might receive excessive pay which animated the litigation in *Kugler v. Yocum* and *Martin*, we must in addition be sensitive to the potential that, in the absence of proper direction from the Legislature, judges might be subject to substantial variations in compensation determined solely by local authorities.

### 3. *The County's Judicial Benefits*

We have been unable to identify any enactment of the Legislature which prescribes the judicial benefits the county pays its judges.

 Although its framework is similar to the enactments considered in *Kugler v. Yocum* and *Martin*, as the Attorney General concluded, section 53200.3 does not fully meet the requirements of the Constitution. Under section 53201, subdivision (a), the Legislature gave local agencies the power to provide their employees "*any* health and welfare benefits for the benefit of its officers, employees, retired employees, and retired members of the legislative body." (Italics added.) There is no limitation on the amount or kinds of benefits a local agency may provide its employees or any requirement the benefits be provided on a uniform basis to all classes and categories of employees, except that the benefits provided to members of an agency's legislative body are limited to "the most generous schedule of benefits being

---

[10] See also article III, section 4 of the Constitution.

received by any category of nonsafety employees." (§ 53208.5, subd. (b).) In the context of the wide range of benefits allowed by section 53201, section 53200.3 only requires that each county provide its judges the same or similar health and employee benefits it provides its "employees." Because, as section 53208.5 expressly recognizes,[11] the benefits permitted under section 53201 may vary substantially between classes and categories of employees and may be subject to abuse, the reference to benefits provided "employees" in section 53200.3 does not contain a readily discernible standard or safeguard. In this regard the provisions of section 53200.3 are distinguishable from the enactments considered and approved in *Kugler v. Yocum* and *Martin*. In both *Kugler v. Yocum* and *Martin*, the salaries of certain employees were tied to salaries of other identified and comparable classes or categories of employees, thus limiting the amount of salary to that of other similarly situated employees. Read in light of sections 53201 and 53208.5, section 53200.3 contains no such safeguard as to the propriety and proportionality of judicial benefits counties may provide.[12]

---

[11] Section 53208.5 states: "(a) It is the intent of the Legislature in enacting this section, to provide a uniform limit on the health and welfare benefits for the members of the legislative bodies of all political subdivisions of the state, including charter cities and charter counties. The Legislature finds and declares that uneven, conflicting, and inconsistent health and welfare benefits for legislative bodies distort the statewide system of intergovernmental finance. The Legislature further finds and declares that the inequities caused by these problems extend beyond the boundaries of individual public agencies. [¶] Therefore, the Legislature finds and declares that these problems are not merely municipal affairs or matters of local interest and that they are truly matters of statewide concern that require the direct attention of the state government. In providing a uniform limit on the health and welfare benefits for the legislative bodies of all political subdivisions of the state, the Legislature has provided a solution to a statewide problem that is greater than local in its effect.

"(b) Notwithstanding any other provision of law, the health and welfare benefits of any member of a legislative body of any city, including a charter city, county, including a charter county, city and county, special district, school district, or any other political subdivision of the state shall be no greater than that received by nonsafety employees of that public agency. In the case of agencies with different benefit structures, the benefits of members of the legislative body shall not be greater than the most generous schedule of benefits being received by any category of nonsafety employees.

"(c) Notwithstanding any other provision of law, members of the legislative body of a city, including a charter city, county, including a charter county, city and county, special district, school district, or any other political subdivision of the state shall not be eligible to accrue multiple health and welfare benefits greater than the most generous schedule of benefits being received by any category of nonsafety employees from two or more public agencies for concurrent service except in the case of a member who serves as a regular full-time employee in a separate public agency.

"(d) This section shall be applicable to any member of a legislative body whose first service commences on and after January 1, 1995."

[12] Moreover, as Sturgeon points out, section 53200.3, which was enacted in 1957, only applies to counties where judges "are paid either in whole or in part from the salary fund of the county." Arguably, enactment of Lockyer-Isenberg did away with the practice of paying judges from the salary funds of counties. (See §§ 77003, 77200, subd. (b).) However this issue was not litigated in the trial court and we do not decide it.

Both section 69894.3 and the audit and credit procedures set forth in Lockyer-Isenberg are also ineffective as legislative prescriptions. They do not require the payment of benefits, let alone set any standard or safeguard which regulate the size or the conditions under which they should be paid. In giving counties *the option* of providing the benefits, and placing no limitation on the kind and amount of those benefits, these statutes in no sense set a fundamental policy with respect to benefits, provide any standard for applying such a policy, or contain any safeguards which would insure that benefits are consistent with the Legislature's adopted policy. Indeed, without violating section 69894.3 or Lockyer-Isenberg, the county could, in any given year, deprive its judges of MegaFlex benefits and continue to provide them to other employees.

Admittedly, in one respect Lockyer-Isenberg goes beyond section 69894.3 and its own audit and credit procedures. As we have noted, in section 3, subdivision (g) of Lockyer-Isenberg, the Legislature expressed its intention that no court personnel employed as of July 1, 1997, suffer any reduction in salary or benefits as a "result of this act." (Stats. 1997, ch. 850, § 3.) As to court personnel, including judges, serving as of July 1, 1997, an argument can be made that this provision of Lockyer-Isenberg set a floor on the benefits to which those judges were entitled. This provision nonetheless would not bring the county's benefits program within the requirements of the Constitution. First, by its terms section 3 of Lockyer-Isenberg only applies to judges serving as of July 1, 1997. We would have to ignore its express provisions to extend its protection to judges who began their service after July 1, 1997. There is also the difficulty posed by the last phrase of section 3, "as a result of this act." That phrase undermines our ability to conclude that by way of Lockyer-Isenberg, the Legislature intended to affirmatively prescribe benefits for superior court judges. However, these defects are relatively minor compared with the absence in Lockyer-Isenberg of any standard or inherent safeguard by which future increases or decreases in judicial benefits would be regulated. The fact the county itself has elected to tie its judicial benefits to the benefits it provides other salaried employees is not a substitute for a legislative mandate that it do so.

Finally, we recognize a significant standard or safeguard may also be found in looking at the overall purposes of an enactment. (See *Carson Mobilehome Park Owners' Assn. v. City of Carson* (1983) 35 Cal.3d 184, 190 [197 Cal.Rptr. 284, 672 P.2d 1297]; *Wilkinson v. Madera Community Hospital* (1983) 144 Cal.App.3d 436, 442 [192 Cal.Rptr. 593].) By its terms Lockyer-Isenberg was enacted so that county contributions to trial court operations would be capped at the level provided in fiscal 1994–1995 and that thereafter increases in court expenses would be the responsibility of the state. The state's assumption of financial responsibility for increases in court operating expenses does not implicitly set any minimum or maximum level of additional benefits counties must provide their judges.

██ Because the benefits provided by the county are compensation within the meaning of section 19, article VI of our Constitution, and because this record does not establish those benefits have been prescribed by the Legislature, the trial court erred in granting the county's motion for summary judgment.[13]

## CONCLUSION

As we have noted, there are valid reasons the county provides its judges with generous employment benefits beyond the employment benefits provided by the state. However, the defect we have found in the method by which those benefits have been provided is itself substantial and important. Under our constitutional scheme, judicial compensation is a matter of statewide concern and the Legislature must set policy with respect to all aspects of judicial compensation. As the cases we have discussed demonstrate, the Legislature's obligation to "prescribe judicial compensation" requires that it set forth standards or safeguards which assure that fundamental policy is implemented. The fact that the Legislature provided counties a credit for judicial benefits when it enacted Lockyer-Isenberg or that it assured the counties that judicial benefits would not be decreased as a result of trial court funding does not meet these requirements. The obligation is not onerous, but does require that the Legislature consider the specific issue and, at a minimum, establish or reference identifiable standards.

Judgment reversed. Appellant to recover his costs of appeal.

Nares, J., and Haller, J., concurred

A petition for a rehearing was denied November 7, 2008, and the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied December 23, 2008, S168408. Werdegar, J., did not participate therein.

---

[13] We emphasize the record before us is limited to the benefits provided by the county. We express no opinion with respect to the judicial benefits provided under other authorities in other counties.

Moreover, we have not separately considered whether all or part of the benefits the county provides its judges are permissible under article VI, section 20 of the Constitution, a question which was not litigated in the trial court.